IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| WILLIAM SHAFER, Derivatively on Behalf of CERENCE, INC., <br><br> Plaintiff, <br><br> v. <br><br> SANJAY DHAWAN, MARK J. GALLENBERGER, ARUN SARIN, THOMAS BEAUDOIN, MARIANNA BUDNIK, SANJAY JHA, KRISTI ANN MATUS, ALFRED NIETZEL, STEFAN ORTMANNS, <br><br> Defendants, <br><br> and <br><br> CERENCE INC., a Delaware corporation, <br><br> Nominal Defendant. | Civil Action No. <br><br><br><br><br> **VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS, BREACH OF FIDUCIARY DUTY, AND UNJUST ENRICHMENT** <br><br><br><br> <u>JURY DEMAND</u> |

Plaintiff William Shafer ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint for Violations of Federal Securities Laws, Breach of Fiduciary Duty, and Unjust Enrichment derivatively for the benefit of Nominal Defendant Cerence Inc. ("Cerence" or the "Company"). Plaintiff bases his allegations on personal knowledge and, as to all other matters outside their personal knowledge, upon information and belief based on the investigation of counsel, which includes without limitation: (i) review and analysis of public filings with the United States Securities and Exchange Commission ("SEC"); (ii) review and analysis of filings in federal court, including pleadings in the related securities fraud class action *City of Miami Fire Fighters' and Police Officers' Retirement Trust v. Cerence, Inc. et al.*, No. 1:22-cv-10321, pending in the United States District Court for the Eastern District of Massachusetts (the "Securities Class

Action"); and (iii) review and analysis of press releases, news reports, analyst reports, industry reports, investor conference call transcripts and slides, and other information available in the public domain.

## I.     INTRODUCTION[1]

1.      This is a stockholder derivative action brought on behalf of and for the benefit of Cerence against certain of the Company's (and its predecessor's) officers and directors seeking to remedy their violations of the federal securities laws, breaches of fiduciary duty, and unjust enrichment.   Defendants' actions have caused substantial financial and reputational harm to Cerence.

2.      Cerence was created on October 1, 2019, as the result of a tax-free spinoff from Nuance Communications, Inc. ("Nuance").   Cerence builds artificial intelligence-powered virtual assistants primarily for the automotive market.   The Company's customers include major automobile original equipment manufacturers ("OEMs") and the OEMs' suppliers.   For example, Cerence identifies as customers, among others, BMW, Daimler, FCA Group, Ford, GM, Renault-Nissan, SAIC, Toyota, Volkswagen Group, Bosch, and Continental.   The Company generates revenue primarily by selling software licenses and cloud-connected services to its OEM and OEM supplier customers.

3.      In the face of industry headwinds, which included a decline in automotive manufacturing due to supply chain issues and semiconductor shortages, Cerence continued to report growing revenues and strong demand for its software licenses beginning on February 8, 2021 (starting the "Relevant Period" which continues to present).   For example, on February 8, 2021, the Officer Defendants (defined herein) touted the Company's fiscal year 2021

---

[1] All emphasis herein is added unless otherwise stated.

revenue and profit metrics for the year because, as they represented, the Company's "business model continues to perform well."

4.     The Company also plugged its "visibility" regarding demand for its products, which allowed the Company to provide long-term guidance for fiscal year 2024.   Indeed, even before February 2021, Cerence instructed investors it expected to earn $600 million in revenue in fiscal year 2024.   Analysts closely tracked and repeatedly inquired with the Officer Defendants about the status of that guidance.   Based on the strong demand Cerence reported, the Company continued to reiterate its fiscal year 2024 guidance until August 9, 2021, when the Company raised its revenue guidance for fiscal year 2024 by more than 16%, from $600 million to $700 million.

5.     Defendants repeatedly assured investors that the Company's guidance took "into consideration the current risks and uncertainties of the semiconductor device shortages that are impacting auto production."

6.     Undisclosed to investors, however, the semiconductor shortage had a materially negative impact on demand for Cerence's software licenses.   In sharp contrast to Defendants' representations that demand for its software licenses remained strong, Cerence was, in reality, "pulling forward" or "pre-banking" license sales.   As a result, the Individual Defendants' (defined herein) statements about Cerence's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

7.     The truth regarding the Individual Defendants' misrepresentations began to be revealed before the financial markets opened on November 22, 2021, when the Company announced revenue guidance for the first quarter and full fiscal year 2022 that was well below analysts' expectations.   In response to this disclosure, Cerence's stock price declined more than 20%, from a closing price of $104.06 the prior trading day, to close at $82.59 on

November 22, 2021.   As the market digested the news, Cerence's stock price declined an additional 5% the following day, to close at $78.27 on November 23, 2021.

8.       Approximately three weeks later, Cerence issued a Current Report on Form 8-K announcing the Company's Chief Executive Officer ("CEO") Sanjay Dhawan ("Dhawan") had abruptly resigned the previous day and that Stefan Ortmanns ("Ortmanns") had been appointed the new CEO.   In reaction to this news, the price of Cerence stock declined an additional 11%, from a closing price of $78.08 on December 14, 2021, to a closing price of $69.20 on December 15, 2021.

9.       In a letter to Cerence stockholders dated December 30, 2021, Chairman of the Board Arun Sarin ("Sarin") stated that "[t]he [C]ompany reported record revenue and surpassed expectations on nearly all key profitability metrics" and highlighted 2021's "$590 million in new bookings driving the [C]ompany's backlog to nearly $2 billion at fiscal year end," "receiv[ing] bookings of $120 million for new products and services," and 17% growth in Company revenue. Sarin also discussed Dhawan's resignation and Ortmanns' ascension to the CEO position, showcasing Ortmanns' leadership of the business that accounted for the vast majority of Cerence's revenue.

10.       Investors only learned the full extent of Defendants' misrepresentations on February 7, 2022, when the Company issued its results for the fiscal first quarter of 2022 ended on December 31, 2021 and shocked the market with three stunning disclosures.   First, the Company announced Chief Financial Officer ("CFO") Mark Gallenberger ("Gallenberger") would be retiring, effective March 11, 2022.   Next, during the related conference call to discuss the Company's results for the quarter, new CEO Ortmanns announced he had conducted a review of the plans, forecasts, and assumptions for each of Cerence's business units, and determined the "conversion from bookings to revenue will take longer than expected."   As a result, Cerence was

forced to lower its fiscal year 2022 guidance, only a few months after providing disappointing guidance for the same period.  Finally, and as a further result of Ortmanns' review, Cerence completely withdrew its closely watched guidance for fiscal year 2024.

11.     In response to these disclosures, the price of Cerence stock fell more than 30%, from a closing price of $63.58 on the prior trading day of February 4, 2022 to close at $43.61 on February 7, 2022.  As of May 10, 2022, Cerence stock is trading at $28.61.

12.     The Individual Defendants are responsible for making and/or allowing false and misleading statements, thereby misleading Company stockholders and investors, violating state and federal securities laws, and breaching their fiduciary duties.  As a direct result, Cerence has suffered significant damage.  Cerence now faces a Securities Class Action alleging that the Company and Defendants Dhawan and Gallenberger violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").  The Securities Class Action seeks to recover hundreds of millions of dollars on behalf of stockholders who purchased or acquired the common stock of Cerence between February 8, 2021 and February 25, 2022.

13.     Due to the Cerence Board of Directors' (the "Board") direct involvement in the wrongdoing, the substantial likelihood of liability its members face, and its members' lack of independence, any demand upon the Board to rectify this wrongdoing would be a wasteful and useless act.  Accordingly, Plaintiff now properly brings this action to remedy the harm to Cerence caused by the Individual Defendants' faithless actions.

## II.     JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa), this Court has jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act.  This Court has supplemental jurisdiction over the remaining claims under 28 U.S.C. § 1367.

15.     This Court has personal jurisdiction over each of the Defendants because each Defendant has sufficient minimum contacts with this District having, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper under 28 U.S.C. § 1391 because: (a) Cerence maintains its principal executive offices in this District; (b) one or more of the defendants reside(s) in this District; (c) a substantial portion of the transactions and wrongs complained of herein took place in this District; and (d) defendants received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.   PARTIES

### A.   Plaintiff

17.     Plaintiff William Shafer is a current stockholder of Cerence and has continuously owned such shares in Cerence since October 19, 2019 when it was spun off from Nuance.

### B.   Nominal Defendant

18.     Nominal Defendant Cerence builds artificial intelligence-powered virtual assistants primarily for the automotive market.  The Company represents that its software platform is a market leader for building integrated, branded, and differentiated virtual assistants for automobiles, composed of edge computing and cloud-connected software components linked together in a software framework.

19.     Cerence was created on October 1, 2019 as the result of a tax-free spinoff from Nuance.  Shares of Cerence common stock trade on the NASDAQ Global Select Market under the ticker "CRNC."  The Company's headquarters are located at 1 Burlington Woods Drive, Suite

301A, Burlington, Massachusetts 01803.  Cerence is incorporated under the laws of the State of Delaware.

### C.    Individual Defendants

20.    Defendant Dhawan was tapped by Nuance as Cerence's President, CEO, and a member of the Board.  Dhawan joined Nuance on June 7, 2019 with the intent that he assume these roles upon completion of the spinoff.  On December 15, 2021, Dhawan abruptly resigned.  Dhawan is named as a defendant in the Securities Class Action that alleges he violated Sections 10(b) and 20(a) of the Exchange Act.  Defendant Dhawan knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements.   In 2021, Cerence paid Dhawan $7,465,574; in 2020, paid him $12,925,893; and in 2019, paid him $105,324.  Additionally, as of December 14, 2021, Dhawan owned 184,829 shares of Cerence stock and 230,819 shares of Cerence stock that had not vested.

21.    Defendant Gallenberger joined Nuance on July 1, 2019 as a Financial Executive to the Automotive Division and was then appointed as CFO of Cerence on October 1, 2019.  On February 7, 2022, Cerence announced Gallenberger would retire on March 11, 2022, but would remain with the Company in an advisory role and provide transitional assistance as requested by the Company from March 11, 2022 through November 15, 2022.  Gallenberger is named as a defendant in the Securities Class Action that alleges violations of Sections 10(b) and 20(a) of the Exchange Act.  Defendant Gallenberger knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements.  In 2021, Cerence paid Gallenberger $2,089,733; in 2020, paid him $3,452,088; and in 2019, paid him $167,087.  Additionally, as of December 14, 2021, Gallenberger owned 69,535 shares of Cerence stock and 67,877 shares of Cerence stock that had not vested.

22.     Defendant Sarin is currently Chairman of the Board and Chair of the Nominating & Governance Committee, serving since October 2019 through present.  In 2021, Cerence paid Sarin $324,962, and as of December 14, 2021, Sarin beneficially owned 28,236 shares of Cerence stock.  Defendant Sarin knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements. Defendant Sarin negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with Cerence's revenue recognition and financial condition.

23.     Defendant Ortmanns is currently President and CEO of Cerence, as well as a director since December 2021 through present.   Previously, Ortmanns served as Cerence's Executive Vice President to the Company's Core Product business group, where he oversaw research and development operations, product management, and strategic partnership management.  Prior to his appointment as Executive Vice President, Ortmanns served as Nuance's Executive Vice President and General Manager of the Automotive Division.  In 2021, Cerence paid Ortmanns $2,081,953; in 2020, paid him $6,976,503; and in 2019, paid him $4,362,768. Additionally, as of December 14, 2021, Ortmanns owned 89,755 shares of Cerence stock and 140,024 shares of Cerence stock that had not vested.  Defendant Ortmanns knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements.  Defendant Ortmanns negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with Cerence's revenue recognition and financial condition.

24.     Defendant Thomas Beaudoin ("Beaudoin") is currently a director at Cerence and has served in that role since October 2019.  Previously, Beaudoin served as Executive Vice President Business Transformation of Nuance from 2017 until 2020 and was responsible for

leading efforts to align and fully leverage technologies within Nuance's key vertical markets, and drive growth while improving margins and cost structure.   In 2021, Cerence paid Beaudoin $234,962, and as of December 14, 2021, Beaudoin beneficially owned 17,378 shares of Cerence stock.  Defendant Beaudoin knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements.  Defendant Beaudoin negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with Cerence's revenue recognition and financial condition.

25.     Defendant Marianne Budnik ("Budnik") is currently a director at Cerence and has served in that role since October 2019.  Budnik is a member of the Compensation Committee and Nominating & Governance Committee.   In 2021, Cerence paid Budnik $243,962, and as of December 14, 2021,   Budnik   beneficially   owned   17,368   shares   of   Cerence   stock. Defendant Budnik knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements. Defendant Budnik negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with Cerence's revenue recognition and financial condition.

26.     Defendant Sanjay Jha ("Jha") is currently a director at Cerence and has served in that role since October 2019.  Jha is Chair of the Compensation Committee and a member of the Audit Committee.   In 2021, Cerence paid Jha $247,462, and as of December 14, 2021, Jha beneficially owned 17,378 shares of Cerence stock.  Defendant Jha knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements.  Defendant Jha negligently violated Sections 14(a) and

20(a) of the Exchange Act by making improper statements in connection with Cerence's revenue recognition and financial condition.

27.     Defendant Kristi Ann Matus ("Matus") is currently a director at Cerence and has served in that role since September 2019.  Matus is Chair of the Audit Committee.  In 2021, Cerence paid Matus $249,962, and as of December 14, 2021, Matus beneficially owned 6,474 shares of Cerence stock.  Defendant Matus knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements.  Defendant Matus negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with Cerence's revenue recognition and financial condition.

28.     Defendant Alfred Nietzel ("Nietzel") is currently a director at Cerence and has served in that role since October 2019.   Nietzel is a member of the Audit Committee, Compensation Committee, and Nominating & Governance Committee.  In 2021, Cerence paid Nietzel $234,962, and as of December 14, 2021, Nietzel beneficially owned 12,378 shares of Cerence stock.  Defendant Nietzel knowingly, recklessly, or with gross negligence made (or allowed to be made) improper statements in Cerence's SEC filings, press releases, and other public statements.  Defendant Nietzel negligently violated Sections 14(a) and 20(a) of the Exchange Act by making improper statements in connection with Cerence's revenue recognition and financial condition.

29.     Defendants Dhawan and Gallenberger are the "Officer Defendants" or the "Securities Class Action Defendants."   Defendants Ortmanns, Sarin, Beaudoin, Budnik, Jha, Matus, and Nietzel are the "Director Defendants."  The Director Defendants and Gallenberger are the "Proxy Defendants."   Defendants Matus, Jha, and Nietzel are the "Audit Committee

Defendants." The Officer Defendants and the Director Defendants are sometimes collectively referred to as the "Individual Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A.   Company Background

30.     Cerence builds artificial intelligence-powered virtual assistants for the mobility/transportation market. The Company's primary target is the automobile market. The Company represents that its software platform is a market leader for building integrated, branded, and differentiated virtual assistants for automobiles. The Company's software platform is composed of edge computing and cloud-connected software components and a software framework linking these components together. The Company also offers customers implementation of its software platform through a professional services organization.

31.     The Company reports revenues in three segments: (1) license; (2) connected services; and (3) professional services. During the Relevant Period, the license segment generated most of the Company's revenue. For example, for the Company's fiscal year 2021 ended on September 30, 2021, the Company reported $387 million in total revenue, where $202 million of that total was in license revenue.

32.     Notably, in connection with the spinoff from Nuance, Cerence entered into agreements with Nuance governing the allocation of intellectual property rights and data related to Nuance's business. These agreements included restrictions for a five-year period from the date of the spinoff on October 1, 2019 that limited the Company's use of Nuance's intellectual property rights and data licensed to Cerence, including limitations on the field of use in which the Company could exercise the licenses.

33.     The five-year "field of use" restriction is slated to end on the first day of the Cerence's fiscal year 2024. As a result, while the Company portrayed itself as a growth company

with visibility into its customers' demand for its products, the Company repeatedly emphasized the importance of its fiscal year 2024 guidance—when the field of use restrictions ended.

34.     For example, during the Company's inaugural Analyst Day on February 18, 2020, then CFO Gallenberger explained, "one of the key takeaways that I want you to walk away from today with as it relates to Cerence is the Company historically has had a very good growth trajectory even in light of the fact that we're part of an auto industry that has low-single-digit growth rates."  Gallenberger continued, "[t]he other key is our visibility."

35.     During the same Analyst Day conference, Gallenberger also provided analysts with fiscal year 2024 guidance, explaining that "we believe that we could grow our total top line from where we are today to about $600 million by fiscal year [20]24."  According to Gallenberger, "this is the target model that we've put out and we've given it a lot of thought internally."

36.     Shortly after providing this guidance, the COVID-19 pandemic and associated supply chain issues had a severe impact on the automobile industry, and the global production of automobiles declined dramatically.  In 2020, the 78 million motor vehicles produced worldwide represented a 15% decline from the prior year.  A widely reported semiconductor shortage continued to ravage the global automobile industry in 2021.  Consulting firm AlixPartners estimated the chip shortage cost the global automotive industry $210 billion in revenue in 2021.

**B.     Defendants' False and Misleading Statements**

37.     On February 8, 2021, just prior to the market opening, Cerence issued a press release announcing the Company's financial results for the first fiscal quarter of 2021 ended December 31, 2020.  In connection therewith, the Company increased its guidance for the fiscal year ending September 30, 2021, with the press release stating in pertinent part:

> [W]e are updating our guidance to reflect our stronger than expected first quarter revenue and margin performance, and also in consideration of the risks and uncertainties surrounding the semiconductor device shortages. Therefore, the lower

end of the revenue range was increased and is now expected to be in the range of $370M to $380M, representing a 12% to 15% increase compared to the prior year.

38.    On the conference call accompanying the Company's release of its fiscal first quarter 2021 results, then CFO Gallenberger stated, "the business model continues to perform well as evidenced by our Q1 results and by raising our revenue and profit metrics for the year."  He continued, "[a] combination of strength in our core business along with opportunities for new business from our new products and adjacent markets paints a bright future for Cerence."

39.    In a question directed to then CEO Dhawan during the same call, an analyst noted that he thought the market was "looking forward to [a promised update later in the year regarding fiscal year 2024 guidance] as it seems things are moving in the right direction."  The analyst continued, "[j]ust curious, given the long-term nature and the potential there, how much visibility do we have now versus sort of we still need things to unfold over the next couple of years."  In response, Dhawan did not change the Company's 2024 guidance, but instead explained that the Company "booked two deals which will contribute revenue to that line . . . so as of now, I'm feeling confident about the progress."

40.    On May 10, 2021, the Company released its fiscal second quarter 2021 results for the quarter ended March 31, 2021.  The press release announcing these results heralded the Company's "record second quarter 2021 results," and Cerence again increased guidance for fiscal year 2021, stating in pertinent part:

> For the fiscal year ending September 30, 2021, we are updating our guidance to reflect stronger than expected first half revenue and margin performance, and also in consideration of the risks and uncertainties surrounding the semiconductor device shortages. Therefore, *the [r]evenue range was increased and is now expected to be in the range of $380M to $390M, representing a 15% to 18% increase compared to the prior year*.

41.     The same press release quoted then CEO Dhawan stating, "[o]ur core license business, in particular, performed better than expected as the global auto recovery takes shape."

42.     During a conference call with analysts the same day, then CFO Gallenberger assured investors that "[o]ur long-term prospects remain bright and our focus on innovation and growth, while at the same time crafting a profitable business model, will benefit the Company and our shareholders well into the future."

43.     On August 9, 2021, the Company released its fiscal third quarter 2021 results for the quarter ended June 30, 2021.  The press release announcing the results again touted "strong third quarter 2021 results."  The press release quoted Defendant Dhawan stating, "[a]ccording to IHS Markit, calendar ***Q2 is expected to be the quarter with the most disruption due to the semiconductor shortage yet we delivered 29% revenue growth over the prior period.***"

44.     On a conference call accompanying the Company's release of these financial results, CFO Gallenberger provided fourth quarter guidance that purportedly accounted for the "the current risks and uncertainties of the semiconductor device shortages that are continuing to impact auto production longer than we expected."  Still, Gallenberger "updated [the Company's] full year expectations based on our Q4 guidance" and highlighted that "***we are now forecasting materially higher revenue, profit margins and EPS estimates versus our original guidance*** that we communicated to you back in November of last year."  Gallenberger further noted that the Company "***did not contemplate the semi shortages in our original guidance, [but] we are still delivering better than expected results despite this unexpected event***, which reaffirms that the digital transformation of the auto industry is alive and well."

45.     During the same conference call, then-CFO Gallenberger explained the Company would not be holding an Analyst Day in September as scheduled due to COVID restrictions.  As

a result, rather than wait for the to-be-determined Analyst Day, the Company decided to provide the market with an update to the Company's fiscal year 2024 midterm target model during the August 9, 2021 conference call.  As then CEO Dhawan explained during the call, "we did feel, however, *it was important to update you on the 2024 model given the positive updates to the original model*."

46.    Defendant Dhawan explained the Company's "bookings momentum" was the basis for the Company increasing its fiscal year 2024 revenue guidance.  Specifically highlighting that Cerence's "multifaceted growth strategy to deliver sustainable growth continues to play out," then CEO Dhawan instructed investors that the Company's "bookings momentum was partly the reason we were able to increase our revenue expectations for [the] 2024 target model." Defendant Gallenberger then provided the specific details of the 2024 guidance update, touting that "on the top line, *we've increased the original target from $600 million to $700 million*." Moreover, "this top line growth takes into account the lower forecasted auto production in 2024." CFO Gallenberger concluded that "we are pleased to be able to *raise our revenue target by $100 million*."

47.    On November 23, 2021, Cerence filed its 2021 Form 10-K Annual Report ("2021 10-K), which was signed by Defendants Dhawan, Gallenberger, Sarin, Beaudoin, Budnik, Jha, Matus, and Nietzel.

48.    The 2021 10-K discussed the Company's revenue and touted its backlog:

Total revenues fiscal year 2021 were $387.2 million, an increase of $56.2 million, or 17.0%, from $331.0 million from fiscal year 2020. The increase in revenues occurred across all product types.

*       *       *

License revenue for fiscal year 2021 was $202.2 million, an increase of $37.9 million, or 23.1%, from $164.3 million for fiscal year 2020. The increase in license

revenue was primarily due to higher volume of licensing royalties as the global auto industry recovered from the COVID-19 pandemic and OEMs increased production. As a percentage of total revenue, license revenue increased by 2.6 percentage points from 49.6% for fiscal year 2020 to 52.2% for fiscal year 2021. Currently, the global automotive industry is experiencing a semiconductor shortage.

                              *      *      *

As of September 30, 2021, we had fixed backlog of $336.4 million, which includes $276.7 million of estimated future revenue related to remaining performance obligations and $59.7 million of contractual commitments which have not yet been invoiced. As of September 30, 2021, we had variable backlog of $1.7 billion, which includes estimated future revenue from variable forecasted royalties related to our embedded and connected businesses. Our estimation of forecasted royalties is based on our royalty rates for embedded and connected technologies from expected car shipments under our existing contracts over the term of the programs. Anticipated shipments are based on historical shipping experience and current customer projections that management believes are reasonable as of the date of this Form 10-K. Both our embedded and connected technologies are priced and sold on a per-vehicle or device basis, where we receive a single fee for either or both the embedded license and the connected service term. However, our fixed and variable backlog may not be indicative of our actual future revenue. The revenue we actually recognize is subject to several factors, including the number and timing of vehicles our customers ship, potential terminations or changes in scope of customer contracts, and currency fluctuations. As of September 30, 2021, we estimate our total backlog to be $2.0 billion, including $336.4 million of fixed backlog and $1.7 billion of variable backlog.

49.     Accordingly, from its February 28, 2021 press release and onward, numerous statements made by and on behalf of Cerence were materially false and misleading when made because of the failure to disclose the following true facts about the Company's business, operations, and prospects (as described in greater detail at ¶¶ 37-48, above):

(a)     that the global semiconductor shortage had a materially negative impact on demand for Cerence's software licenses;

(b)     that Defendants masked the impact of the semiconductor shortage on demand for the Company's software licenses by pulling forward sales; and

(c)     that, as a result of the above, Defendants' statements about Cerence's business, operations, and prospects were false and misleading and/or lacked a reasonable basis when made.

### C.     The False and Misleading Proxy Statement

50.     In addition to the above false and misleading statements issued and/or caused to be issued by the Individual Defendants, the Individual Defendants caused the Company to issue another false and misleading proxy statement during the Relevant Period.  The Company filed Form DEF 14A with the SEC on December 30, 2021 (the "2021 Proxy").[2]

51.     The 2021 Proxy began with a letter from Defendant Sarin to shareholders, boasting that "[t]he company reported record revenue and surpassed expectations on nearly all key profitability metrics," the "Company revenue grew 17% year over year despite the negative impact of COVID-19 on automotive production," and the Company "[s]ecured $590 million in new bookings driving the company's backlog to nearly $2 billion at fiscal year end."

52.     The 2021 Proxy letter from Defendant Sarin also discussed Cerence's change in executive leadership, stating, "As many of you are aware, Stefan Ortmanns was recently named the new CEO and a Director when, Sanjay Dhawan, our former CEO, resigned in December.  I would like to thank Sanjay [Dhawan] for his leadership and contributions and wish him success going forward.  We were very fortunate to have someone of Stefan's caliber in the company to immediately step into the role without disruption to the business."

53.     As part of an overview of the Company, the 2021 Proxy stated, among other things, "[o]ur revenue for fiscal year 2021 under generally accepted accounting principles ('GAAP') was $387.2 million, up 17.0% from $331.0 million in fiscal 2020."

---

[2] These proxy allegations are based solely on negligence; they are not based on any allegations of recklessness or knowing conduct by or on behalf of the Proxy Defendants, and they do not allege fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to the proxy allegations and related claims.

54.     Under the headline of "Executive Summary," the 2021 Proxy highlighted the fiscal 2021 year for the Company: "Notwithstanding ongoing challenges due to the impact of the semiconductor shortage on auto production and continuing headwinds due to the pandemic, fiscal year 2021 was a strong year for the Company," together with a table showing $387.2 million of revenue, 17% increase over 2020 revenue, and increase of 15.7% in operating margin.

55.     Under the same headline of "Executive Summary," the 2021 Proxy discussed the absence of relative shareholder return metric, stating: "We feel that it is more important to focus management on important internal financial metrics like revenue and earnings.  If we grow the bottom line, we anticipate this will be recognized by our investors with an increased stock price." "[Dhawan, Gallenberger, and Ortmanns] already have a significant incentive to grow the stock price of the Company with significant portions of the total compensation allocated to stock-based long-term incentives: 50% of long-term incentives are RSUs and 50% are PSUs."   Indeed, Dhawan, Gallenberger, and Ortmanns achieved 107% of their $385 million revenue target and $586 million of bookings to receive their payouts.

56.     The 2021 Proxy also recommended shareholders vote to elect Defendants Ortmanns, Matus, and Sarin.  The 2021 Proxy stated:

**Corporate Governance Guidelines**

The Board is governed by its Corporate Governance Guidelines, which were adopted by the Board in September 2019 and are available under "Governance – Documents & Charters" in the Investors section of our website, www.cerence.com. These guidelines cover, among other items, the following significant topics:

*Board Selection Process and Qualifications.* The Nominating & Governance Committee is responsible for reviewing the appropriate skills and characteristics required of prospective Board members and is responsible for recommending to the Board candidates for directorship. The Nominating & Governance Committee evaluates each individual in the context of the Board as a whole, with the objective of recommending a group that will best serve the interests of the Company and its shareholders. Among the criteria the Board may consider are experience and

diversity, and, with respect to diversity, the Board may consider such factors as gender, race, ethnicity, differences in professional background, experience at policy making levels in business, finance and technology and other areas, education, skill, and other individual qualities and attributes. The Board endorses the value of seeking qualified directors from backgrounds relevant to the Company's mission, strategy and business operations and perceived needs of the Board at a given time.

\*      \*      \*

The Board believes that candidates for director should have certain minimum qualifications, including: (1) the highest personal and professional ethics and integrity; (2) skills that are complementary to those of the existing Board; (3) proven achievement and competence in the nominee's field; (4) relevant expertise upon which to be able to offer meaningful advice and guidance to management and make significant contributions to the Company's success; (5) sufficient time to devote to affairs of the Company and contribute to the Company's goals; (6) demonstrated excellence in their field; (7) the ability to exercise sound business judgment; (8) the ability to meet other requirements as may be required by applicable rules, such as financial literacy or financial expertise with respect to Audit Committee members; and (9) an understanding of the fiduciary responsibilities that are required of a member of the Board and the commitment of time and energy necessary to diligently carry out those responsibilities.

\*      \*      \*

## Code of Business Conduct and Ethics

We have adopted a written Code of Business Conduct and Ethics that is designed to deter wrongdoing and to promote, among other things:

• honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

• the avoidance of conflicts of interest, including disclosure to an appropriate person or persons identified in the code of any transaction or relationship that reasonably could be expected to give rise to such a conflict;

• full, fair, accurate, timely, and understandable disclosure in reports and documents that we file with, or submit to, the SEC and in other public communications we make;

• compliance with applicable governmental laws, rules and regulations, including foreign corrupt trade practices;

• adherence to all policies, including insider trading policies;

• the prompt internal reporting to an appropriate person or persons identified in the code of violations of the code; and

• accountability for adherence to the code.

*       *       *

**Board's Role in Risk Oversight**

The Board has an active role, as a whole and also at the committee level, in overseeing management of Company risk. This role is one of informed oversight rather than direct management of risk. The Board reviews and consults with management on strategic direction, challenges and risks faced by the Company. The Board also reviews and discusses with management quarterly financial results and forecasts. The Audit Committee oversees management of financial risks, including investment and foreign currency fluctuation risk mitigation policies and risks. The Board's oversight on cybersecurity includes updates from senior management and the Company's experts in areas such as cybersecurity threats, and technologies and solutions both deployed internally and for the benefit of the Company's customers, including technologies, and policies and procedures to address these risks. The Compensation Committee of the Board is responsible for overseeing the management of risks relating to and arising from the Company's compensation plans and arrangements. These committees provide regular reports— generally on a quarterly basis—to the full Board.

Management has responsibility for the direct management and oversight of legal, financial, cybersecurity, privacy and commercial compliance matters, which includes identifying areas of risk and implementing policies, procedures and practices to mitigate the identified risks. Additionally, the CFO and General Counsel provide periodic reports to the Audit Committee concerning financial, tax, legal and compliance related risks and the Company's experts report to the Board on cybersecurity. Management also provides the Audit Committee with periodic reports on the Company's compliance programs and efforts, investment policy and practices, and compliance with debt covenants. Management and the Compensation Committee's compensation consultant provide analysis of risks related to the Company's compensation programs and practices to the Compensation Committee.

*       *       *

**<u>Audit Committee</u>**

**<u>Primary Responsibilities</u>**

The Audit Committee was established in accordance with Section 3(a)(58)(A) and Rule 10A-3 under the Exchange Act. The responsibilities of our Audit Committee

are more fully described in our Audit Committee charter, and they include, among other duties:

• Appointing, approving the compensation of, and assessing the engagement and independence of our independent registered public accounting firm;
• Pre-approving auditing and permissible non-audit services, and the terms of such services, to be provided by our independent registered public accounting firm;

• Reviewing and discussing with management and our independent registered public accounting firm our annual and quarterly financial statements and related disclosures as well as critical accounting policies and practices used by us;

• Considering matters relating to our accounting policies and coordinating the oversight and reviewing the adequacy of our internal controls over financial reporting;

• Inquiring about significant risks, reviewing our policies for enterprise risk assessment and risk management, and assessing the steps management has taken to control these risks;

• Establishing policies and procedures for the receipt and retention of accounting related complaints and concerns;

• Monitoring the integrity of our financial statements and our compliance with legal and regulatory requirements as they relate to our financial statements and accounting matters; • Preparing the Audit Committee report required by the SEC to be included in our annual proxy statement;

• Reviewing all related person transactions for potential conflict of interest situations and approving all such transactions;

• Reviewing the overall audit plan with our independent registered public accounting firm and members of management responsible for preparing our financial statements and reviewing whether non-audit services provided by the independent registered public accounting firm affect the accountants' independence; and

• Reviewing the scope of our annual audits.

## Financial Expertise and Independence

The Audit Committee has three members, each of whom is financially literate and meets the enhanced independence standards established by the Sarbanes-Oxley Act of 2002 and related rulemaking of the SEC. In addition, our Board has determined that Ms. Matus and Mr. Nietzel are audit committee financial experts as defined by Item 407(d)(5)(ii) of Regulation S-K of the Exchange Act.

**Report**

The Audit Committee Report is included in this Proxy Statement.

*       *       *

## AUDIT COMMITTEE REPORT

The Audit Committee oversees the accounting and financial reporting processes of the Company, including establishing, assessing, and maintaining internal controls and audits of the financial statements of the Company on behalf of the Board. The Company's management has primary responsibility for the financial statements and for assessing and maintaining effective internal control over financial reporting.

The Audit Committee acts pursuant to a written charter. A copy of the charter is available under "Governance – Documents & Charters" in the Investors section of the Company's website, www.cerence.com. The Audit Committee is comprised solely of independent directors as defined by the Nasdaq listing standards and Rule 10A-3 of the Exchange Act.

The Audit Committee reviewed with management the Consolidated and Combined Financial Statements in the Annual Report on Form 10-K for the fiscal year ended September 30, 2021, including a discussion of the quality, not just the acceptability, of the accounting principles, the reasonableness of significant judgments, the clarity of disclosures in such financial statements and the effectiveness of the internal control over financial reporting. The Audit Committee reviewed with BDO USA, LLP, who are responsible for expressing an opinion on the conformity of those audited financial statements with generally accepted accounting principles, their judgments as to the quality, not just the acceptability, of the Company's accounting principles. In addition, the Audit Committee has discussed with BDO USA, LLP the matters required to be discussed by applicable requirements of the Public Company Accounting Oversight Board. The Audit Committee has received the written disclosures and the letter from BDO USA, LLP required by applicable requirements of the Public Company Accounting Oversight Board regarding BDO USA, LLP's communications with the Audit Committee concerning independence, and has discussed with BDO USA, LLP its independence.

In reliance on the reviews and discussions referred to above, the Audit Committee recommended to the Board, and the Board has approved, that the audited Consolidated and Combined Financial Statements be included in the Company's Annual Report on Form 10-K for the fiscal year ended September 30, 2021 for filing with the SEC.

*       *       *

**Compensation Committee**

**Primary Responsibilities**

The responsibilities of our Compensation Committee are more fully described in our Compensation Committee charter, and they include, among other duties:

• Overseeing compensation plans, policies and benefit programs applicable to our executive officers;

• Approving the compensation of our executive officers;

• Overseeing the administration of our cash and equity-based incentive compensation plans that are shareholder approved and/or where participants include executive officers and directors;

• Reviewing and discussing with management the Company's "Compensation Discussion and Analysis" section included in its proxy statement and producing a report on executive compensation to be included in the proxy statement; and

• Assessing the results of the most recent advisory vote on executive compensation and taking such assessment into consideration when establishing the compensation of the Company's executive officers.

57.     The 2021 Proxy was false and misleading because, while it assured investors that it would keep stockholders informed and its Audit Committee reviewed filings, including the 2021 10-K, that was not the case, as revealed by the Company's press release announcing the fiscal first quarter 2022 financial results and the complete withdrawal of the Company's fiscal 2024 financial guidance model.  The December 15, 2021 8-K, February 7, 2022 8-K, February 8, 2021 10-Q, May 10, 2021 10-Q, August 9, 2021 10-Q, and 2021 10-K together demonstrate that the Proxy Defendants allowed each other and the Company to issue false and materially misleading statements during the Relevant Period.

58.     Indeed, the 2021 Proxy relied on and incorporated the mischaracterizations of Cerence's financial condition and business prospects, specifically:

        (a)        that the global semiconductor shortage had a materially negative impact on demand for Cerence's software licenses;

(b) that Defendants masked the impact of the semiconductor shortage on demand for the Company's software licenses by pulling forward sales; and

(c) that, as a result of the above, Defendants' statements about Cerence's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

### D. The Truth Emerges

59. The truth regarding Cerence's business was partially revealed to the market before the financial markets opened on November 22, 2021, when the Company released its results for fiscal fourth quarter and full year 2021. The press release announcing the results reported quarterly revenue of $98.1 million and full-year revenue of $387.2 million. While these results were mostly in line with expectations, the Company provided fiscal year 2022 guidance "for revenue to be in the range of $400M to $425M," which represented guidance well below analysts' expectations.

60. During the call with analysts accompanying the financial results release, CFO Gallenberger explained that the Company's "*fiscal [20]22 revenue growth is expected to be in the range of plus 3% to plus 10%.*" Seeking to bolster investor confidence, however, Gallenberger reminded investors that the Company "*continue[d] to increase our estimates throughout the [prior] year and ultimately delivered . . . .*" CFO Gallenberger then explained, "[w]e believe it's prudent for us to factor some level of conservatism into our guidance due to the ongoing semiconductor shortage plaguing the auto industry and the continued uncertainty of the timing of when the semi supply chain will ultimately be corrected." Finally, Gallenberger provided guidance for the first quarter of fiscal year 2022: "revenue guidance of $91 million to $96 million[, which] reflects a year-over-year change of down 3% to up 3% or essentially flat."

61. Nevertheless, during the same call, the Company continued to "maintain its guidance for fiscal 2024." Analysts on the call were particularly focused on the Company's fiscal 2024 guidance. For example, Evercore analyst Chris McNally asked for Defendant Dhawan's

24

"reiterated outlook of 2024" and whether "anything changed since you initially gave that outlook for $700 million a couple of months ago?"  Defendant Dhawan emphatically responded, "no, nothing has changed.  We stand by our guide for fiscal [20]24 and we feel good about it."  He further explained:

> the net-net basically is, in the fiscal [20]24 model, the new – the core business is going strong, and we stand behind the growth that we have projected in our core business whether it's license or connected services or professional services . . . . So from my standpoint, ***no change to the fiscal [20]24 model***.

62.     Defendant Gallenberger added, "the bookings that we're seeing today gives us that level of comfort that the revenue will come into that 2024 target model."

63.     Despite Defendants' efforts to assure investors, in reaction to the Company lowering its fiscal year 2022 guidance, the price of Cerence stock dropped by more than 20% on extremely high trading volume, from a closing price of $104.06 on November 19, 2021, to a closing price of $82.59 per share on November 22, 2021.  As the market digested the news, Cerence's stock price declined an additional 5% the following day, to close at $78.27 on November 23, 2021.

64.     The truth continued to leak out to investors when, before the markets opened on December 15, 2021, the Company filed a Current Report on Form 8-K with the SEC announcing CEO Dhawan had resigned the prior day and that Dhawan was being replaced as CEO by Stefan Ortmanns.  The announcement of the abrupt resignation of Dhawan caused the price of Cerence stock to fall an additional 11%, from a closing price of $78.08 per share on December 14, 2021, to close at $69.20 per share on December 15, 2021.

65.     The full truth was finally revealed to the market on February 7, 2022, when the Company announced its financial results for the fiscal first quarter of 2022 and the impending retirement of Defendant Gallenberger.

66.     First, the Company filed a Form 8-K with the SEC announcing that CFO Gallenberger "intends to retire from the Company effective March 11, 2022."

67.     Next, the Company's press release announcing the fiscal first quarter 2022 financial results revealed that the Company was now providing:

> full-year guidance [] for revenue to be in the range of $365 million to $385 million, representing a 9% decrease at the midpoint compared to the initial FY22 guidance provided on November 22, 2021, and a 3% decrease at the mid-point compared to last year's actual revenue of $387 million.

68.     During the conference call held with analysts that same day, new CEO Ortmanns explained that "since being appointed CEO, [he] reviewed each business unit plans, forecasts and assumptions."  Following his assessment, Ortmanns found "the conversion from bookings to revenue will take longer than expected."

69.     Finally, CEO Ortmanns announced the Company was "***withdrawing the fiscal [20]24 target model previously provided*** as we are defining the new vision and strategy for growth and profitability over the next five years."

70.     Analysts on the conference call expressed confusion about the Company's revenue prospects, among other things.  For example, one analyst questioned the amount of dollars "you effectively pulled ahead here" and the "cumulative dollar amount that you think you've basically pre-banked?"

71.     In response to these disclosures, the price of Cerence stock dropped more than 30%, from a closing price of $63.58 on February 4, 2022, to a closing price of $43.61 per share on February 7, 2022.

72.     Analysts excoriated the Company for these disclosures.  For example, Craig-Hallum analyst Jeff Van Rhee issued a report on February 8, 2022 describing the "shockingly messy quarter, guide and explanation as new leadership resets expectations."  In downgrading the

Company, Wedbush analyst Daniel Ives reported the same day that the "very weak guidance [for 2022] indicates that underlying OEM deals and momentum is slowing in a concerning fashion." He went on to note that "[t]he disappointing guide was blamed on uncertainty around deals, chip shortage, and a host of other issues which were not clear to investors (and us)."  Also downgrading Cerence, Jefferies analyst David Kelley noted, "pre-booked, yet to be consumed licenses suggest ongoing revenue headwinds."  Finally, RBC Capital Markets analyst Joseph Spak, in a report dated February 8, 2022, observed that "the optics of the old CEO and now the CFO leaving amid lower guidance and withdrawing FY24 targets is not great in our view," and "we see little reason for investors to buy the stock."

## V.    DAMAGES TO CERENCE

73.    As a result of the Individual Defendants' improprieties, Cerence disseminated improper public statements concerning its business, operations, and prospects.  These improper statements have devastated Cerence's credibility and caused the Company to lose millions in market capitalization.

74.    These actions have irreparably damaged Cerence's corporate image and goodwill. For at least the foreseeable future, Cerence will suffer from what is known as the "liar's discount," a term applied to the stock of companies who have been implicated in misleading the investing public, such that Cerence's ability to raise equity capital or debt on favorable terms in the future is now and will continue to be impaired.  The Company stands to incur higher marginal costs of capital and debt because of the misconduct.

75.    The Individual Defendants' improper course of conduct has also subjected the Company to potentially hundreds of millions of dollars in damages in connection with the Securities Class Action.  The Securities Class Action alleges that the Company and the Securities

Class Action Defendants violated federal securities laws by repeatedly misrepresenting the Company's business, operations, and prospects.

76.     As a direct and proximate result of the Individual Defendants' misconduct, the Company has needlessly expended, and will continue to expend, significant sums of money.  These expenditures include, without limitation: (i) costs and damages associated with executive turnover; (ii) costs incurred in connection with issuing false and misleading proxy solicitations seeking re-election of three Director Defendants;  (iii) costs incurred in investigating and defending Cerence and the Securities Class Action Defendants in the Securities Class Action; (iv) lost sales and orders resulting from exposure of Cerence's misleading disclosures regarding its business, operations, and prospects; and (v) costs incurred from compensation and benefits paid to the Individual Defendants, who have breached their fiduciary duties to Cerence.

## VI.   DEFENDANTS' DUTIES

### A.   The Individual Defendants' Fiduciary Duties

77.     By reason of their positions as officers and/or directors of Cerence and because of their responsibility to control the business and corporate affairs of the Company, the Individual Defendants owed, and owe, the Company and its stockholders the fiduciary obligations of good faith, loyalty, due care, and candor and were, and are, required to use their utmost ability to control and manage the Company in a just, honest, fair, and equitable manner.

78.     Each Individual Defendant owed, and owes, the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company, as well as the highest obligations of fair dealing and not to act in furtherance of their personal interest or benefit.

79.     In *Gantler v. Stephens*, 965 A.2d 695, 708-09 (Del. 2009), the Delaware Supreme Court concluded that the "officers of Delaware corporations, like directors, owe fiduciary duties

of care and loyalty, and that the fiduciary duties of officers are the same as those of directors."
The officers of a Delaware corporation are "expected to pursue the best interests of the company
in good faith (*i.e.*, to fulfill their duty of loyalty) and to use the amount of care that a reasonably
prudent person would use in similar circumstances (*i.e.*, to fulfill their duty of care)." *Hampshire
Grp., Ltd. v. Kuttner*, No. 3607-VCS, 2010 Del. Ch. LEXIS 144, at *35 (Del. Ch. July 12, 2010).

80.     Because of their positions of control and authority as officers and/or directors of
Cerence, the Individual Defendants were able to, and did, directly and/or indirectly, exercise
control over the wrongful acts complained of herein.   Because of their advisory, executive,
managerial, and directorial positions with Cerence, each of the Individual Defendants had
knowledge of material, nonpublic information regarding the Company.   In addition, as officers
and/or directors of a publicly held company, the Individual Defendants had a duty to promptly
disseminate accurate and truthful information regarding the Company's business, operations, and
prospects so that the market price of the Company's stock would be based on truthful and accurate
information.

81.     At all times relevant hereto, each of the Individual Defendants was the agent of
each of the other Individual Defendants and of Cerence and was at all times acting within the
course and scope of such agency.

82.     To discharge their duties, the Individual Defendants were, and are, required to
exercise reasonable and prudent oversight and supervision over the management, policies,
practices, and controls of Cerence.   By virtue of such duties, the Individual Defendants were, and
are, required to, among other things:

> a.     exercise good faith to ensure that the Company is operated in a diligent,
> efficient, honest, and prudent manner and in accordance with all applicable
> laws (including federal and state laws, government rules and regulations,
> and the Company's Certificate of Incorporation and Bylaws);

b.    neither violate nor knowingly permit any officer, director, or employee of Cerence to violate any applicable laws, rules, or regulations;

c.    remain informed as to the status of Cerence's operations, and upon receipt or notice of information of imprudent or unsound practices, to make a reasonable inquiry in connection thereto and to take steps to correct such conditions or practices;

d.    establish and maintain systematic and accurate records and reports of the business and affairs of Cerence and procedures for the reporting of the Company's business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

e.    maintain and implement an adequate, functioning system of internal controls, such that the affairs and operations of Cerence are conducted in accordance with all applicable laws, rules, and regulations; and

f.    truthfully and accurately inform and guide investors and analysts with respect to the business operations of the Company.

83.    Additionally, as a part of their duties of care and loyalty, defendants had a fiduciary duty to disclose all material information whenever they voluntarily chose to speak to Cerence shareholders, or the market generally, about the business of the corporation. *Pfeffer v. Redstone*, 965 A.2d 676, 684 (Del. 2009) ("Corporate fiduciaries can breach their duty of disclosure under Delaware law . . . by making a materially false statement, by omitting a material fact, or by making a partial disclosure that is materially misleading.") (citation omitted); *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998) ("directors who knowingly disseminate false information that results in corporate injury or damage to an individual stockholder violate their fiduciary duty, and may be held accountable in a manner appropriate to the circumstances"); *Zirn v. VLI Corp.*, 681 A.2d 1050, 1056 (Del. 1996) ("[D]irectors are under a fiduciary obligation to avoid misleading partial disclosures.  The law of partial disclosure is likewise clear: 'Once defendants travel[] down the road of partial disclosure . . . they . . . [have] an obligation to provide the stockholders with an accurate, full, and fair characterization of those historic events.'") (citation omitted); *Lynch v. Vickers Energy Corp.*, 383 A.2d 278, 281 (Del. 1977) (holding the defendants breached their

fiduciary duty of candor when they failed to disclose material information to minority shareholders to whom they owed a fiduciary duty).

84.     As the Delaware Supreme Court explained in *In re Tyson Foods, Inc. Consol. S'holder Litig.*, No. 1106-CC, 2007 WL 2351071, at *4 (Del. Ch. Aug. 15, 2007), "[w]hen . . . directors communicate with shareholders, they also must do so with complete candor":

> Loyalty. Good faith. Independence. Candor. These are words pregnant with obligation. The Supreme Court did not adorn them with half-hearted adjectives. Directors should not take a seat at the board table prepared to offer only conditional loyalty, tolerable good faith, reasonable disinterest or formalistic candor.

**B.     Duties Pursuant to the Company's Corporate Governance Guidelines**

85.     The Company's Corporate Governance Guidelines ("Governance Guidelines") were adopted by the Board to, along with the certificate of incorporation, bylaws, and Board committee charters, form the framework for governance of the Company.  These guidelines apply to the Director Defendants in connection with their membership on Cerence's Board.

86.     According to the Governance Guidelines, the Board's role is:

> It is the principal duty of the Board to exercise its powers in accordance with its fiduciary duties to the Company and in a manner it reasonably believes to be in the best interests of the Company and its stockholders. The Board, which is elected by the Company's stockholders, oversees the management of the Company and its business.

87.     According to the Governance Guidelines, candidates for director should have certain minimum qualifications, including:

> (i) the highest personal and professional ethics and integrity; (ii) skills that are complementary to those of the existing Board; (iii) proven achievement and competence in the nominee's field; (iv) relevant expertise upon which to be able to offer meaningful advice and guidance to management and make significant contributions to the Company's success; (v) sufficient time to devote to affairs of the Company and contribute to the Company's goals; (vi) demonstrated excellence in their field; (vii) the ability to exercise sound business judgment; (viii) meet other requirements as may be required by applicable rules, such as financial literacy or financial expertise with respect to audit committee members; and (ix) an understanding of the fiduciary responsibilities that is required of a member of the

Board and the commitment of time and energy necessary to diligently carry out those responsibilities.

88.     According to the Governance Guidelines, the function of the Board is described as follows:

> The business and affairs of the Company shall be under the oversight of the Board. This includes overseeing the conduct of the Company's business by management and review of the Company's financial objectives and major corporate plans, strategies and actions. Directors are expected to promote the best interests of stockholders in terms of corporate governance, fiduciary responsibilities, compliance with applicable laws and regulations, and maintenance of accounting, financial or other controls. Directors will participate in the selection, evaluation and, where appropriate, replacement of the Chief Executive Officer. Directors may also provide input to the Chief Executive Officer for the evaluation, as well as the recruitment, of the principal senior executives of the corporation.

### C.     Duties Pursuant to the Company's Code of Conduct and Business Ethics

89.     The Individual Defendants were also bound by the Company's Code of Conduct and Business Ethics (the "Code of Conduct"), which applies to all Cerence's directors, officers, and employees.   Among other things, the Code of Conduct states that: "All Employees are expected to read and understand this Code, uphold these standards in day-to-day activities, and comply with all applicable policies and procedures" and that Code of Conduct "has been reasonably designed to deter wrongdoing and to promote" "[a]ccountability for adherence to th[e] Code [of Conduct]."

90.     The Company's Code of Conduct includes the following policies and procedures:

1.     Honest and ethical conduct

Employees are expected to act and perform their Company duties ethically and honestly and with the utmost integrity. This includes conducting their duties in a manner that is free from fraud or deception and in conformity with accepted professional standards. Employees should endeavor to deal honestly, ethically and fairly with the Company's customers, suppliers, partners, competitors, employees and other personnel.

*        *        *

3.      Protection and Proper Use of Company Assets

All Employees should promote and ensure the efficient and responsible use of the Company's assets and resources. Theft, carelessness and waste have a direct impact on the Company's profitability. Any suspected incidents of fraud, theft or other improper use of Company assets or resources should be immediately reported for investigation.

*      *      *

5.      Accuracy of Records

Employees must honestly and accurately report all business transactions. You are responsible for the accuracy of your records and reports. Accurate information is essential to the Company's ability to meet legal and regulatory obligations.

All Company books, records and accounts should be maintained in accordance with all applicable regulations and standards and accurately reflect the true nature of the transactions they record. The financial statements of the Company shall conform to generally accepted accounting rules and the Company's accounting policies. No undisclosed or unrecorded account or fund should be established for any purpose. No false or misleading entries should be made in the Company's books or records for any reason, and no disbursement of corporate funds or other corporate property should be made without adequate supporting documentation.

6.      Disclosure

The Company is required to file periodic and other reports with the SEC and to make other public communications. The Company's reports and documents filed with or submitted to the SEC and its other public communications shall include full, fair, accurate, timely and understandable disclosure to the extent required by applicable law. Any Employee who becomes aware of or suspects any improper transaction, accounting or auditing practice within the Company, or believes that the Company's internal accounting and disclosure controls are deficient or the Company is not providing full, fair, accurate, timely and understandable disclosures in its filings with the SEC or in other public communications, is required to report the matter immediately to the Company's General Counsel or the Chairperson of the Audit Committee or as set forth herein. The General Counsel has primary authority and responsibility for receiving, collecting, reviewing, processing and resolving concerns and reports by Employees and others involving the Company's accounting, auditing and internal controls and disclosure policies, subject to the supervision of the Audit Committee. The General Counsel shall maintain appropriate records of all complaints, tracking their receipt, investigation and resolution and shall prepare a periodic summary report thereof for the Audit Committee.

\*       \*       \*

9.      Compliance

It is the Company's policy to comply with all applicable laws, rules and regulations. It is the personal responsibility of each Employee in executing his or her Company duties to adhere to the standards and restrictions imposed by those laws, rules and regulations, and in particular, those relating to accounting and auditing matters. In addition, it is the personal responsibility of each Employee to comply with all of the Company's policies, including but not limited to its Related Party Transactions, Foreign Corrupt Trade Practices and Insider Trading policies. If an Employee has any question regarding compliance with any applicable law, rule, regulation or Company policy, such Employee should discuss the situation with the General Counsel.

10.      Accountability, Reporting and Disciplinary Actions

The matters covered in this Code are of the utmost importance to the Company, its stockholders and its business partners, and are essential to the Company's ability to conduct its business in accordance with this Code and the Company's policies. The Company expects all Employees to adhere to this Code and all of the Company's policies in carrying out their responsibilities for the Company.

Situations that may involve a violation of this Code may not always be obvious and may require difficult judgments to be made. Employees should report any concerns or questions about violations of laws, rules, regulations or this Code to the Company's General Counsel or as set forth herein.

Any concerns about violations of laws, rules, regulations or this Code by the Chief Executive Officer, any senior financial officer, any executive officer or director should be reported promptly to the Chairperson of the Audit Committee as set forth herein. Reporting to the Audit Committee may be accomplished by filing a report to www.whistleblowerservices.com/cerence. If appropriate, the Chairperson of the Audit Committee will notify the Board of Directors. Reporting of such violations may also be done anonymously by filing a report at www.whistleblowerservices.com/cerence. An anonymous report should provide enough information about the incident or situation to allow the Company to investigate properly. If concerns or complaints require confidentiality, including keeping an identity anonymous, the Company will endeavor to protect this confidentiality, subject to applicable laws, regulations or legal proceedings.

The Company encourages all Employees to report any suspected violations promptly and intends to investigate thoroughly any good faith reports of violations. The Company will not tolerate any kind of retaliation for reports or complaints regarding misconduct that were made in good faith. Employees are required to cooperate in internal investigations of misconduct and unethical behavior.

The General Counsel will have primary authority and responsibility for the enforcement of this Code, subject to the supervision of the Audit Committee. The Company will devote the necessary resources to enable the General Counsel or a designee thereof acting under the auspices of the General Counsel to establish such procedures as may be reasonably necessary to create a culture of accountability and facilitate compliance with this Code, and will also maintain appropriate records of all complaints, tracking their receipt, investigation and resolution and shall prepare a periodic summary report thereof for the Audit Committee. The Company will take appropriate action against any Employee whose actions are found to violate these policies or any other policies of the Company. Disciplinary actions may include immediate termination of employment or business relationship at the Company's sole discretion. Where the Company has suffered a loss, it may pursue its remedies against the individuals or entities responsible. Where laws have been violated, the Company will report violators to, and cooperate with, the appropriate authorities.

Where violation of this Code is disputed by an Employee, such alleged violation will be investigated by the General Counsel or a designee thereof acting under the auspices of the General Counsel, who shall make a determination following such investigation as to whether or not such a violation has occurred. Where a violation of this Code is disputed by an executive officer or director, such alleged violation will be investigated by the Board of Directors or a designee thereof, which shall make a determination following such investigation as to whether or not such a violation has occurred. Such a determination by the Company and/or the Board will be final.

### D.    Additional Duties of the Audit Committee Defendants

91.     In addition to the fiduciary duties discussed above, the Audit Committee Defendants owed specific duties to Cerence under the Charter of the Audit Committee of the Board of Directors (the "Audit Charter").

92.     According to the Audit Charter, the Audit Committee's primary purpose is to:

- Oversee the accounting and financial reporting processes of the Company and audits of the financial statements of the Company;
- Assist the Board in oversight and monitoring of (i) the integrity of the Company's financial statements, (ii) the Company's compliance with legal and regulatory requirements, (iii) the independent auditor's qualifications, independence and performance, and (iv) the Company's internal accounting and financial controls;
- Provide the Company's Board with the results of its monitoring and recommendations derived therefrom; and

- Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.
- the Company's internal accounting and financial controls,
- the Company's treasury and finance matters, and
- the Company's risk management and assessment pertaining to, amongst other matters, the financial, operational, accounting and tax matters of the Company, including data privacy and security.

93.     The Audit Charter charges the Audit Committee Defendants with the following duties and responsibilities, among others:

Review the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management and the independent auditors to review the adequacy of such controls and to review before release the disclosure regarding such system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

Review and provide guidance with respect to the external audit and the Company's relationship with its independent auditors including by: (1) reviewing the independent auditors' proposed audit scope, approach and independence; (2) obtaining on a periodic basis a statement from the independent auditors regarding relationships and services with the Company which may impact independence or objectivity, and to the extent there are relationships, monitoring and investigating such relationships, including actively engaging in a dialogue with the independent auditors with respect to any disclosed relationships or services that may impact the objectivity and independence of the independent auditors, and presenting such information to the Board; (3) receiving and reviewing a report by the independent auditors describing any material issues raised by the most recent internal quality control review, or peer review, of the independent auditing firm, or by any inquiry or investigation by governmental or professional authorities and any steps taken to deal with any such issues; (4) discussing with the Company's independent auditors the financial statements and audit findings, including any significant adjustments, management judgments and accounting estimates, significant new accounting policies, any alternative treatments of financial information within generally accepted accounting principles that the independent auditor has discussed with management, ramifications of the use of these alternative disclosures and the treatment preferred by the independent auditor and disagreements with management and any other matters described in PCAOB Auditing Standard 1301, as may be modified or supplemented ("AS 1301") or any successor standard; and (5) reviewing reports submitted to the Committee by the independent auditors in accordance with the applicable SEC requirements and other legal or regulatory requirements;

Recommend to the Board as to whether the Company's audited financial statements should be included in the Company's Annual Report on Form 10-K based on the Committee's review and discussions (1) with management of the audited financial statements, (2) with the independent auditor of the matters required to be discussed by AS 1301, and (3) with the independent auditor concerning the independent auditor's independence;

Review and discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including: (1) the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," (2) all critical accounting policies and practices used by the Company, (3) all alternative accounting treatments of financial information reported in GAAP related to material items that have been discussed with management, including the ramifications of the use of such alternative treatments and disclosures and the treatment preferred by the Company's independent auditor, (4) any reports or communications (and management's responses thereto) submitted to the Committee by the Company's independent auditor in accordance with AS 1301, and (5) any other material written communications between the Company's independent auditor and management, prior to filing the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively, with the SEC;

Review and discuss with management and the Company's independent auditor (1) major issues regarding, or significant changes in, the Company's accounting principles and financial statement presentations, (2) analyses prepared by management or the Company's independent auditor concerning significant financial reporting issues and judgments made in connection with the preparation of the financial statements, (3) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the financial statements of the Company, and (4) the type of information to be included in earnings press releases and any financial information and earnings guidance provided to analysts and rating agencies;

Conduct a post-audit review of the financial statements and audit findings, including any significant suggestions for improvements provided to management by the independent auditors;

Review before release the unaudited quarterly operating results to be stated in the Company's quarterly earnings release with particular attention to any use of "pro forma" or "adjusted" non-GAAP information;

Review and discuss with management and the Company's independent auditors the preparation and content of any officer certifications required by the Sarbanes-Oxley Act or the SEC to be filed with the Company's Quarterly Report on Form 10-Q, Annual Report on Form 10-K or any other periodic report;

Discuss with management and internal audit representatives the activities, organizational structure and qualifications of the Company's internal audit function;

Review any reports by management or internal auditors regarding the effectiveness of, or any deficiencies in, the design or operation of internal controls and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls and reviewing before release the disclosure regarding the Company's system of internal controls required under SEC rules to be contained in the Company's periodic filings and the attestations or reports by the independent auditors relating to such disclosure;

Oversee compliance with legal requirements for disclosure of auditor's services and Committee members, member qualifications and activities;

Perform those functions delegated to the Committee set forth in the Company's Code of Business Conduct and Ethics;

Review, in conjunction with counsel, any legal matters that could have a significant impact on the Company's financial statements;

Provide oversight and review at least annually of the Company's financial risk management policies, including its investment policies;

\*       \*       \*

Provide a report in the Company's proxy statement in accordance with the rules and regulations of the SEC;

Establish procedures for receiving, retaining and treating complaints received by the Company regarding accounting, internal accounting controls or auditing matters and procedures for the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters; and

Review and discuss with management, the independent auditor and the internal auditor, the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures.

\*       \*       \*

In addition to preparing the report for inclusion in the Company's proxy statement in accordance with the rules and regulations of the SEC, the Committee will make regular reports to the Board regarding its activities.

## VII.   DERIVATIVE ALLEGATIONS

94.   Plaintiff brings this action derivatively in their own right and for the benefit of the Company to redress injuries suffered, and to be suffered, by Cerence as a direct result of the violations of the federal securities laws, breaches of fiduciary duty, and unjust enrichment by the Individual Defendants.

95.   Cerence is named as a nominal defendant in this case solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

96.   Plaintiff is a current stockholder of Cerence and has continuously owned such shares since at least October 19, 2019, December 8, 2020, and December 18, 2020, respectively. Plaintiff plans to hold Cerence shares continuously throughout the pendency of this action. Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in prosecuting this action.

97.   Because current members of the Cerence Board lack independence and/or face a substantial likelihood of liability for the acts and omissions complained of herein, prosecution of this action, independent of the current Board, is in the best interests of the Company and its stockholders.

98.   The wrongful acts complained of herein subjected, and continue to subject, Cerence to harm.

## VIII.   FUTILITY ALLEGATIONS

99.   Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

100.   Cerence's current Board consists of Defendants Ortmanns, Matus, Sarun, Jha, Nietzel, Beaudoin, and Budnik (the "Demand Board").  Plaintiff has not made any demand on the Demand Board to institute this action because such a demand would be a futile and useless act.

101.   There is reasonable doubt that a majority of Demand Board members are capable of independently considering a demand to commence and vigorously prosecute an action against the Individual Defendants (which includes themselves).

**A.   Demand Is Excused as to Ortmanns and Beaudoin Because They Lack Independence**

102.   Cerence has conceded in its SEC filings that Ortmanns is not an independent director.   Specifically, in the Company's December 30, 2021 Proxy Statement on SEC Form DEF 14A, Cerence concedes that the Board did not find Ortmanns to be independent under the NASDAQ's listing rules.   Furthermore, Ortmanns is not an independent director because his principal professional occupation is his employment with Cerence.   Ortmanns is the Company's CEO and has received and continues to receive substantial monetary compensation and other benefits.   This lack of independence renders Ortmanns incapable of impartially considering a demand to commence and vigorously prosecute this action.

103.   Beaudoin similarly lacks independence due to having recently served as Executive Vice President Business Transformation of Nuance from 2017 until 2020 and was responsible for leading efforts to align technologies within Nuance's key vertical markets, including automotive, to drive growth and improve margins.   Beaudoin's concurrent employment with Nuance and serving as a director when Cerence was spun off show lack of independence.   Beaudoin beneficially owns 17,378 shares of Cerence worth $134,962 as of December 30, 2021, and cash compensation of $100,000.   Like Ortmanns, Beaudoin was tied to Dhawan through the spin off from Nuance and had financial incentive to conceal the misconduct described herein.   This lack of independence renders Beaudoin incapable of impartially considering a demand to commence and vigorously prosecute this action.

**B.     Demand Is Excused Because All Demand Board Members Face a Substantial Likelihood of Liability for Their Misconduct**

104.    As set forth herein, Demand Board members Ortmanns, Matus, Sarun, Jha, Nietzel, Beaudoin, and Budnik breached their fiduciary duties of loyalty and good faith by making or allowing to be made improper statements in Cerence's press releases, public filings, and other public statements.  Notably, these defendants signed the Company's false and misleading 2021 Proxy, which misrepresented Cerence's revenue, bookings, and the effects of the semiconductor shortage that were affecting its business and financial outlook.

105.    Demand Board members further violated Sections 14(a) and 20(a) of the Exchange Act by negligently making material misstatements and omitting material facts in connection with their proxy solicitations, as described herein.

106.    Accordingly, all the members of the Demand Board face a substantial likelihood of liability for their breaches of fiduciary duty and violations of state and federal law, making any demand upon them futile.

**C.     Demand Is Excused Due to the Audit Committee's Role in the Misconduct**

107.    Pursuant to the Company's Audit Committee Charter, the Audit Committee Defendants are responsible for overseeing, among other things, the integrity of the Company's financial statements, the Company's compliance with laws and regulations, and the Company's accounting and financial reporting practices and system of internal controls.

108.    Demand Board members Matus, Jha, and Nietzel, as members of the Audit Committee, had a duty to adequately oversee Cerence's compliance with legal and regulatory requirements, including public disclosure controls and procedures, as well as its risk assessment and management, and internal control functions.  Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements

detailed herein.  The Audit Committee Defendants breached their fiduciary duty of loyalty and good faith by approving or otherwise allowing the improper statements, and therefore failing to properly oversee Cerence's compliance with legal and regulatory requirements, risk assessment, and the Company's internal controls.

109.    The Audit Committee Defendants failed to ensure the integrity of the Company's financial statements and internal controls, as they are charged to do under the Audit Charter, and allowed the Company to issue false and misleading financial statements with the SEC.  Thus, the Audit Committee Defendants breached their fiduciary duties, are not disinterested, and demand is excused as to them.

## D.    Demand Is Excused for Additional Reasons

110.    Any suit by the Demand Board to remedy these wrongs would significantly increase the exposure of Nominal Defendant Cerence to liability for violations of the federal securities laws in the pending Securities Class Action and would potentially result in civil actions being filed against one or more additional Director Defendants.

111.    Ortmanns, Sarin, Beaudoin, Budnik, Jha, Matus, and Nietzel are likewise conflicted and unable to pursue the Company's claims against the Officer Defendants.   Any effort to prosecute such claims against the Officer Defendants for their direct roles in the violations of applicable law carried out in Cerence's name would necessarily expose the Board's own culpability for the very same conduct.  In other words, given that the Board was required to be regularly informed concerning the Company's operations, business, prospects, and public reporting, any effort by the Board to hold the Officer Defendants liable would lead the Officer Defendants to defend on the ground that their own conduct was consistent with corporate policy and practice, as established by and known to the Demand Board.

112.    Demand Board members Jha, Budnik, and Nietzel serve together on the Compensation Committee.   These individuals set their own compensation, as well as the compensation of their colleagues on the Demand Board.  Their capacity to dole out compensation for themselves and their colleagues makes it impossible for each of them, and any of them, to independently and disinterestedly consider a stockholder demand to investigate or prosecute an action pertaining to the Individual Defendants' improper conduct.  This is especially so in light of the revenue targets set for executive payouts and Nietzel's concurrent service on the Audit Committee.

113.    The acts complained of constitute violations of the fiduciary duties owed by Cerence's officers and directors, and these acts are incapable of ratification.  Despite having knowledge of the claims and causes of action raised by Plaintiff, the Board has failed to take any action against those responsible, much less seek to recover on behalf of the Company for any of the wrongdoing by the Individual Defendants.

## IX.    CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

114.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct alleged herein as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

115.    During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that: (i) misrepresented the Company's business, operations, and prospects; and (ii) enhanced the Individual Defendants' executive and directorial positions at Cerence and the profits, power, and prestige that the Individual Defendants enjoyed as

a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

116.    The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused and/or allowed the Company to issue improper public statements.

117.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, and unjust enrichment, and to conceal adverse information concerning the Company's business, operations, and prospects.

118.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

119.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## X.    CLAIMS FOR RELIEF

### COUNT I

### Violations of Section 14(a) and 20(a) of the Exchange Act
### (Against the Proxy Defendants)

120.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

121.    The Section 14(a) and 20(a) Exchange Act claims alleged herein are based solely on negligence.  They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants.  The Section 14(a) and 20(a) Exchange Act claims alleged herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegation of reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

122.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his [or her] name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

123.    Rule 14a-9, promulgated pursuant to Section 14(a) of the Exchange Act, provides that no proxy solicitation shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

124.    Between December 30, 2021 and February 2, 2022, the Proxy Defendants solicited stockholder votes to elect Ortmanns, Matus, and Sarin to the Board through use of materially false and misleading statements and failures to disclose in their proxy solicitations as set forth at ¶¶ 50-58, above.  In soliciting stockholder votes, the Proxy Defendants misrepresented and failed to disclose the following true facts about the Company's business, operations, and prospects (as described in greater detail at ¶¶37-48; ¶¶50-58):

> (a)    that the global semiconductor shortage had a materially negative impact on demand for Cerence's software licenses;
>
> (b)    that Defendants masked the impact of the semiconductor shortage on demand for the Company's software licenses by pulling forward sales; and
>
> (c)    that, as a result of the above, Defendants' statements about Cerence's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

125.    The Proxy Defendants negligently issued, caused to be issued, and participated in the issuance of materially false and misleading statements to stockholders, which were made for the purpose of soliciting stockholder votes to approve the election of Ortmanns, Matus, and Sarin to the Board and approval of the compensation of certain executive officers, including Ortmanns. In the exercise of reasonable care, the Proxy Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements made would be rendered materially false and misleading.

126.    The proxy solicitation process was connected to the misrepresentations in the Company's 2021 10-K and related quarterly filings and an integral component to three of the Defendants retaining their seats on the Board.

127.    As a direct and proximate result of these defendants' wrongful conduct, Cerence and the Proxy Defendants misled and/or deceived Cerence's stockholders by making materially

false and misleading statements regarding the Company's revenue and the deleterious effects of the semi-conductor shortage.

128.    The Company was damaged as a result of the Individual Defendants' materially false and misleading statements in their proxy solicitations.  Plaintiff, on behalf of Cerence, hereby seeks relief for damages inflicted upon the Company based upon the misleading proxy solicitations in connection with the election of three Director Defendants (as described in ¶¶50-58, above) and regarding the Company's revenues, bookings, and effects of the global semiconductor shortage on its business.

129.    Because of their positions of control and their authority over Cerence, the Proxy Defendants were able to and did control the actions of the companies, their employees, and the contents of the proxy solicitations, as set forth herein.  The Proxy Defendants therefore qualify as "controlling persons" within the meaning of Section 20(a) of the Exchange Act.  By reason of the above conduct, the Proxy Defendants are also, or alternatively, liable as control persons Cerence pursuant to Section 20(a) of the Exchange Act.

## COUNT II

### Breach of Fiduciary Duties
### (Against the Officer Defendants)

130.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

131.    The conduct of the Officer Defendants complained of herein involves a knowing and culpable violation of their obligations as officers of Cerence, the absence of good faith on their part, and a reckless disregard for their duties to the Company that the Officer Defendants were aware, or reckless in not being aware, posed a risk of serious injury to the Company.

132.    The Officer Defendants owed fiduciary duties to Cerence and its stockholders.  By reason of their positions as fiduciaries to the Company, the Officer Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  In addition, the Officer Defendants had specific fiduciary duties as defined by the Company's corporate governance documents, including its Code of Conduct, and principles that, had they been discharged in accordance with the Officer Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

133.    The Officer Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)     Affirmatively making, allowing, controlling, and/or failing to correct improper and misleading statements in Cerence's press releases, SEC filings, conference calls, and other public statements, relating to, among other things, Cerence's business, operations, and prospects;

(b)     Failing to ensure the Company's compliance with relevant legal and regulatory requirements, as well as its own internal policies and procedures, including but not limited to requirements imposed under federal and state securities laws and the Company's Code of Conduct;

(c)     Failing to implement, maintain, and monitor adequate internal controls; and

(d)     Paying or causing the Company to pay themselves compensation while in breach of their fiduciary duties, which also included share-based compensation awarded at share prices that were artificially inflated by their misconduct.

134.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, Cerence has sustained significant damages.  Accordingly, the Officer Defendants are liable to the Company.

135.    In addition, each of the Officer Defendants had actual knowledge of the Individual Defendants' breaches of fiduciary duties, knowingly participated in the breaches, and Cerence has

sustained significant damage as a result.  Accordingly, the Officer Defendants are further liable to the Company for aiding and abetting their fellow defendants' breaches.

136.    Plaintiff, on behalf of Cerence, has no adequate remedy at law.

## COUNT III

### Breach of Fiduciary Duties
### (Against the Director Defendants)

137.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

138.    The Director Defendants owed fiduciary duties to Cerence and their stockholders. By reason of their positions as fiduciaries, the Director Defendants owed duties of good faith, loyalty, candor, and truthful disclosure.  In addition, the Director Defendants have and had specific fiduciary duties as defined by relevant corporate governance documents, including the Governance Guidelines, the Code of Conduct, the charters of various Board committees, and principles that, had they been discharged in accordance with the Director Defendants' obligations, would have prevented the misconduct and the consequent harm to the Company.

139.    The Director Defendants consciously breached their fiduciary duties and violated their corporate responsibilities in at least the following ways:

(a)    Affirmatively making, allowing, controlling, and/or failing to correct improper and misleading statements in Cerence's press releases, SEC filings, conference calls, and other public statements, relating to, among other things, Cerence's business, operations, and prospects;

(b)    Failing to ensure the Company's compliance with relevant legal and regulatory requirements, as well as its own internal policies and procedures, including but not limited to requirements imposed under federal and state securities laws and the Company's Code of Conduct, Governance Guidelines, and the Audit Charter;

(c)    Failing to implement, maintain, and monitor adequate internal controls, including adequate and effective disclosure controls; and

(d)     Paying or causing the Company to pay themselves and the Officer Defendants annual compensation while in breach of their fiduciary duties, which also included share-based compensation awarded at share prices that were artificially inflated by their misconduct.

140.    The Director Defendants that were members of the Audit Committee further breached their duties by approving or otherwise allowing the improper statements, which they knew or were reckless in not knowing omitted material facts and contained material misstatements. The Audit Committee Defendants also completely and utterly failed in their duty of oversight and failed to properly oversee Cerence's (i) compliance with legal and regulatory requirements, (ii) public disclosure controls and procedures, (iii) risk assessment and management, and (iv) internal control functions.

141.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, Cerence has sustained significant damages.  Accordingly, the Director Defendants are liable to the Company.

142.    In addition, each of the Director Defendants had actual knowledge of the Individual Defendants' breaches of fiduciary duties, knowingly participated in the breaches, and Cerence has sustained significant damage as a result.  Accordingly, the Director Defendants are further liable to the Company for aiding and abetting their fellow defendants' breaches.

143.    Plaintiff, on behalf of Cerence, has no adequate remedy at law.

**COUNT IV**

**Unjust Enrichment**
**(Against the Individual Defendants)**

144.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

145.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Cerence.  The Individual Defendants were

unjustly enriched as a result of the compensation and officer and director remuneration they received while breaching their fiduciary duties.

146.     Plaintiff, as a stockholder and representative of Cerence, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

147.     Plaintiff, on behalf of Cerence, has no adequate remedy at law.

## XI.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Finding that a stockholder demand on the Demand Board would have been a futile and useless act;

B.     Finding that the Individual Defendants violated the federal securities laws, breached their fiduciary duties to the Company, and were unjustly enriched;

C.     Directing Cerence to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Cerence and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's Bylaws or Articles of Incorporation, and taking such other action as may be necessary to place before stockholders for a vote the following corporate governance proposals or policies:

- a proposal to appropriately test, and then strengthen, the Company's internal-operational control functions;

- a proposal to appropriately test, and then strengthen, the Company's disclosure controls to ensure that all material information is adequately and timely disclosed to the SEC and public;

- a proposal to strengthen the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

51

- a proposal to develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

- a proposal to declassify the Board; and

- a proposal to permit the stockholders of Cerence to nominate three new candidates for election to the Board.

D.      Finding against each of the Individual Defendants in favor of Cerence for the amount of damages sustained by Cerence, jointly and severally, in an amount to be determined at trial, together with pre- and post-judgment interest at the maximum legal rate allowable by law;

E.      Requiring the Individual Defendants to return to Cerence all compensation and remuneration of whatever kind paid to them by Cerence during the time that they were in breach of the fiduciary duties;

F.      Directing the Individual Defendants to establish, maintain, and fully fund effective corporate governance and compliance programs to ensure that Cerence's directors, officers, and employees do not engage in wrongful or illegal practices;

G.      Granting appropriate equitable and/or injunctive relief to remedy the Individual Defendants' misconduct, as permitted by law;

H.      Awarding to Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees and expenses; and

I.      Granting such other and further relief as this Court deems just and equitable.

## XII.   DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Dated: May 10, 2022

**DISERIO MARTIN O'CONNOR &
CASTIGLIONI LLP**

*/s/ Jonathan P. Whitcomb*
JONATHAN P. WHITCOMB

40 Broad Street
Boston, MA  02109
Telephone: (617) 906-3359
Facsimile: (203) 348-2321
jwhitcomb@dmoc.com

**JOHNSON FISTEL, LLP**
MICHAEL I. FISTEL
40 Powder Springs Street
Marietta, GA  30064
Telephone: (470) 632-6000
Facsimile: (770) 200-3101
MichaelF@johnsonfistel.com

FRANK J. JOHNSON
655 West Broadway, Suite 1400
San Diego, CA  92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856
FrankJ@johnsonfistel.com

*Attorneys for Plaintiff*