# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| IN RE CERENCE STOCKHOLDER DERIVATIVE ACTION | Civil Action No. 1:22-cv-10723-ADB |

## MEMORANDUM AND ORDER

BURROUGHS, D.J.

Plaintiffs William Shafer and Peter Morse ("Plaintiffs") bring this consolidated derivative action against nominal Defendant Cerence, Inc. ("Cerence" or "the Company") and nine of its officers and directors (the "Individual Defendants," and, collectively with Cerence, "Defendants"), alleging violations of various provisions of the Exchange Act, as well as claims for breach of fiduciary duty, unjust enrichment, and insider trading. See generally [ECF No. 18-3 ("Consolidated Amended Complaint" or "CAC")]. Before the Court is Defendants' motion to dismiss the Consolidated Amended Complaint asserting that Plaintiffs failed to make the requisite pre-suit demand on the Company's Board and that the Consolidated Amended Complaint fails to state a claim for relief. [ECF No. 39]. Because Plaintiffs failed to make a demand, Defendants' motion is **GRANTED**.

## I.    BACKGROUND

### A.    Procedural History

The instant consolidated action originated as two related derivative cases. On May 10 and 12, 2022, respectively, Plaintiffs William Shafer and Peter Morse filed verified shareholder derivative complaints on behalf of nominal Defendant Cerence against various current and former officers and directors. [ECF No. 1]; see also Morse v. Dhawan et al., No. 1:22-cv-01073

(D. Mass.).  On June 10, 2022, the parties stipulated to the consolidation of the two derivative cases, and the Court endorsed the stipulation.  [ECF Nos. 13, 14].  The same day, the parties stipulated to staying the consolidated action pending the outcome of the Company's anticipated motion to dismiss in a related securities class action, City of Miami Firefighters' & Police Officers' Retirement Tr. v. Cerence Inc., No. 1:22-10321 (D. Mass.) (the "Securities Action"); [ECF No. 15].  In accord with the stipulation, the Court stayed the consolidated action on June 27, 2022.  [ECF No. 16].  On September 12, 2023, during the stay, Plaintiffs filed the operative Consolidated Amended Complaint.  See generally [CAC].

Another derivative case was filed in Delaware Court of Chancery on August 17, 2023, Fleming v. Dhawan, No. 2023-0845 (Del. Ch.) (the "Delaware Action"), with substantially similar allegations.  The Delaware Action was also stayed pending the decision on the motion to dismiss in the Securities Action.  [ECF No. 32-5].

On March 25, 2024, the Court entered an order granting in part and denying in part Defendants' motion to dismiss the Securities Action.  City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. Cerence Inc., No. 22-cv-10321, 2024 WL 1258149, at *18 (D. Mass. Mar. 25, 2024) ("Cerence I").  The order dismissed all but three alleged misstatements.  Id.[1]  As a result, the stay in this action was lifted, and the Court ordered briefing on whether the action should be dismissed in light of any relevant forum-selection clause.  [ECF No. 29].  Defendants filed their motion to dismiss on May 24, 2024, [ECF No. 30], which Plaintiffs opposed on June 7, 2024, [ECF No. 33].  The Court denied Defendants' motion to dismiss under the applicable forum-selection clause on December 20, 2024.  [ECF No. 34].

---

[1] The Securities Action was ultimately settled, with this Court approving that settlement on December 18, 2024.  [ECF No. 41-20].

Defendants filed the present motion to dismiss the Consolidated Amended Complaint on February 3, 2025, [ECF No. 39], Plaintiffs opposed on March 20, 2025, [ECF No. 43], and Defendants filed a further reply in support of their motion on April 3, 2025, [ECF No. 45].

**B.    Factual Background**

The following facts are taken from the Consolidated Amended Complaint, the well-pleaded factual allegations of which are assumed to be true when considering a motion to dismiss, see Ruivo v. Wells Fargo Bank, N.A., 766 F.3d 87, 90 (1st Cir. 2014), as well as "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice."[2]  Giragosian v. Ryan, 547 F.3d 59, 65 (1st Cir. 2008) (alteration in original) (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 20 (1st Cir. 2003)).

---

[2] Of note, Plaintiffs appear to contend that this Court cannot consider the exhibits Defendants attached to their motion to dismiss unless the motion is converted into one for summary judgment.  [ECF No. 43 at 10, n.5]; see also [ECF No. 43-1 ¶¶ 4–6].  This is incorrect. Defendants' exhibits consist of Securities and Exchange Commission ("SEC") filings, earnings call transcripts and press releases, earnings video presentations, and documents referenced in Plaintiffs' complaint, which Cerence produced pursuant to Del. Code Ann. tit. 8, § 220, permitting stockholders to make a written demand to inspect a corporation's "books and records" for certain purposes. Del. Code Ann. tit. 8, § 220.  As it may, the Court takes judicial notice of the public SEC filings, earnings call transcripts, and press releases under Federal Rule of Evidence 201(b)(2).  See Metzler Inv. GMBH v. Corinthian Colleges, Inc., 540 F.3d 1049, 1064 n.7 (9th Cir. 2008); see also Primo v. Pac. Biosciences of Cal., Inc., 940 F.Supp.2d 1105, 1115 n.1 (N.D. Cal. 2013) (taking judicial notice of earnings call transcripts because they are "capable of immediate determination by resort to accurate sources and not subject to reasonable dispute"); In re Bare Escentuals, Inc. Sec. Litig., 745 F. Supp. 2d 1052, 1067 (N.D. Cal. 2010) ("The court is also permitted to take judicial notice of the content of relevant public disclosure documents required to be filed with the SEC, as well as of press releases and conference call transcripts cited in the complaint.").  It also takes judicial notice of the § 220 documents as incorporated by reference, given that they are discussed at length in the Consolidated Amended Complaint, [CAC ¶¶ 71–92], and Plaintiffs do not dispute their authenticity.  Watterson v. Page, 987 F.2d 1, 3 (1st Cir. 1993).

The Court writes for the parties and assumes the reader's familiarity with the facts of this action, which it has set out in detail in its order on the motion to dismiss the Securities Action and which are incorporated herein. Cerence I, 2024 WL 1258149, at *1–7. The following supplements that prior writing with facts relevant to this derivative action.

### 1.   Cerence, Defendants, and the Demand Board

Nominal Defendant Cerence is a Delaware corporation headquartered in Burlington, Massachusetts which builds artificial intelligence-powered virtual assistants, and it derives most of its revenue from selling software licenses for its technology which is integrated into automobiles. [CAC ¶¶ 30, 41–47]. It became a public company on October 1, 2019 as the result of a tax-free spin-off from Nuance Communications, Inc. [Id. ¶ 30].

The Individual Defendants are nine of the Company's current and former executive officers and directors. [CAC ¶¶ 1, 31–39]. Sanjay Dhawan was President, Chief Executive Officer ("CEO"), and a member of the Board from the spin-off until he resigned on December 15, 2021. [Id. ¶ 31]. Mark Gallenberger was Chief Financial Officer ("CFO") from the spin-off until his retirement in March 2022. [Id. ¶ 32]. Stefan Ortmanns was Cerence's Executive Vice President for its Core Product business group until he succeeded Dhawan as President and CEO in December 2021, and he was a member of the Board when this action was filed on May 10, 2022. [Id. ¶ 34]. Tom Beaudoin served on Cerence's Board as a director throughout the relevant time period and also became Cerence's CFO on May 5, 2022. [Id. ¶ 35]. The remaining Defendants (Arun Sarin, Marianne Budnik, Sanjay Jha, Kristi Ann Matus, and Alfred Nietzel) were independent, outside members of the Board when this action was filed on May 10, 2022. [Id. ¶¶ 33, 36–39, 172 n.3]. The seven Individual Defendants who were serving on the Board at

the time this action was filed, [3] along with non-party Douglas Davis, are known as the "Demand Board." [Id. ¶ 173].

### 2.   Fixed and Variable Licenses and the "Pull-Forward" Scheme

As discussed at length in the Securities Action, Cerence's licensing business is divided into "variable" and "fixed" license agreements. [CAC ¶¶ 7, 48]. Pursuant to variable license agreements, Cerence receives quarterly "royalty reports" from customers detailing the number of licenses utilized, and, using these royalty reports, Cerence charges the customer on a "pay-as-you-go" basis and recognizes the revenue in the subsequent quarter. [Id. ¶ 5]. Fixed license deals, on the other hand, require customers to purchase upfront a predetermined quantity of licenses, typically at a discount, and Cerence recognizes the revenue at the time of signing. [Id. ¶ 6]. Cerence utilizes two types of fixed license deals: 1) traditional "prepaid" deals, which require customers to pay the discounted rate in full and up front, [id.], and 2) "minimum commitment" deals, which Cerence introduced in 2021 and which, while requiring customers to commit to purchase a certain quantity of licenses within a fixed time period, permit the customer to pay for the licenses when they are actually utilized, [id. ¶¶ 12–13].

Although fixed agreements have the benefit of providing immediate revenue, they also leave the customer with a large inventory of licenses, hindering further purchases until that stock is depleted. [CAC ¶ 7]. As a result, fixed license agreements curtail future demand for licenses, negatively impacting revenue flow and the Company's prospective financial performance. [Id.]. Variable license deals, by contrast, provide for consistent and predictable revenue flow, making them Cerence's preferred method for generating revenue. [Id. ¶¶ 5, 48].

---

[3] For clarity, those Individual Defendants again are: Ortmanns, Beaudoin, Sarin, Budnik, Jha, Matus, Nietzel.

Both the Securities Action and this derivative action center on the same general alleged misconduct, namely that by November 2020, because of threats to revenue caused by a global semiconductor shortage, the Individual Defendants were artificially inflating the Company's short-term revenues by 1) pushing customers into fixed contracts and 2) converting existing variable contracts to fixed contracts.  [CAC ¶¶ 8, 58].  This "pull-forward" scheme permitted the Individual Defendants to recognize more revenue up front, tout revenue growth to the market, and claim that Cerence outperformed financial expectations in fiscal year 2021, while, unbeknownst to investors, current and future variable licenses were being cannibalized, harming long-term revenue prospects.  [Id.].

### 3.  Communications with the Board

One way this case differs from the Securities Action is that Plaintiffs have made additional allegations concerning communications with the Board about fixed contracts.  [CAC ¶¶ 71–87].  These allegations incorporate by reference Board materials that Cerence produced to Plaintiffs pursuant to 8 Del. Code Ann. tit. 8, § 220.

The Company's Board and its Audit Committee—which was responsible for, among other things, oversight and monitoring of the Company's financial statements, internal accounting, and financial controls, [CAC ¶ 162]—met quarterly, [id. ¶¶ 72–74 (January 20, 2021 Board and Audit Committee meetings); ¶ 75 (April 28, 2021 Audit Committee meeting); ¶ 76 (April 29, 2021 Board meeting); ¶ 77 (August 3, 2021 Audit Committee meeting); ¶ 78 (August 4, 2021 Board meeting); ¶¶ 79–83 (November 8, 2021 Audit Committee meeting); ¶ 84 (November 11, 2021 Board meeting)].  At these meetings, the Board and the Audit Committee discussed and received presentations regarding the Company's preliminary financial results for

6

each quarter and key financial metrics.  Specifically, the Consolidated Amended Complaint

alleges that the Board and the Audit Committee received the following information:

- At the January 2021 meetings, the Board and Audit Committee received data indicating that "Cerence was experiencing difficulties signing new business" but that, despite this, "[r]evenue grew to $65.0 million."  [CAC ¶¶ 72–74].  The Board was told that the Company "expect[ed] recovery in Q2."  [Id.].

- At the April 2021 meetings, the Board and Audit Committee received data indicating that "bookings were well below plan" and that revenue for variable licenses was "flat to Q121."  [CAC ¶¶ 75–76].  They also learned that, despite these struggles, revenue increased over the prior quarter, which was "driven by fixed license (+$4.5M) [and] variable license (+$6M), offset by decrease in Pro Services (-$3M)."  [Id.].

- At the August 2021 meetings, the Board and Audit Committee were informed that Cerence had "[e]xceeded all financial metrics" for the third quarter of 2021, that this was driven in part by fixed contracts, and that the variable license royalties continued to stagger "due to semi-chip shortage."  [CAC ¶ 77].

- At the November 2021 meeting, the Board and Audit Committee were informed that Q4 revenue "increased 7% year-over-year," which was "mainly driven by increase in fixed license (+$8M), and 1-time Apple deal (+$5.2M)."  [CAC ¶ 79]; see also [id. ¶ 80 (Board was told that the "[f]ixed license deals were driven by 2 Minimum Commitment deals [with] Elektrobit ($12M) and Pioneer ($10M)"].  The Board presentations also noted that the increased revenue was in part "due to higher than expected prepays/min commit deals in FY21," as well as "[c]annibalization" of variable deals, which "increase[ed] by $28M."  [Id. ¶ 83].

These presentations to the Board also broke down the proportion of revenue that was

attributable to fixed license agreements, which mirrored what the Company disclosed to

investors in earnings calls around the same time.  [ECF No. 41-9 at 7 (January 2021 Board

presentation reporting $10 million fixed revenue); ECF No. No. 41-5 at 3 (first quarter 2021

earnings presentation reporting $10.1 million fixed revenue)]; [ECF No. 41-10 at 8 (April 2021

Board presentation reporting $17 million fixed revenue); ECF No. 41-11 at 3 (second quarter

2021 earnings presentation reporting $17.3 million fixed revenue)]; [ECF No. 41-12 at 8 (August

2021 Board presentation reporting $18 million fixed revenue); ECF No. 41-13 at 3 (third quarter

2021 earnings presentation reporting $18.2 million fixed revenue)]; [ECF No. 41-14 at 8–9

November 2021 Board presentation reporting $25 million fixed revenue for fourth quarter 2021 and $71 million fixed revenue for fiscal year 2021); ECF No. 41-6 at 3–4 (fourth quarter earnings presentation reporting $25.4 million fixed revenue for the fourth quarter and $71 million for fiscal year 2021)].  The Board, like investors, was also told that the Company was targeting, at most, $50 million in fixed contracts in fiscal year 2021, and, when fixed revenue greatly exceeded this threshold for fiscal year 2021, it was informed that the Company was aiming to decrease fixed revenue in fiscal year 2022.  [ECF No. 41-14 at 9–10 (November 2021 Board presentation noting $50 million fixed revenue target for fiscal year 2021, $71 million actual fixed revenue, and $60 million target for fiscal year 2022)]; [ECF No. 41-16 (earnings call informing investors that the Company was targeting around $50 million in fixed revenue for fiscal year 2021)]; [ECF No. 41-15 at 4–5 (earnings call informing investors the Company intended to decrease fixed revenue in fiscal year 2022 by approximately $12 million to $14 million)].

### 4.   2021 Proxy

On December 30, 2021, Defendants Sarin, Ortmanns, Beaudoin, Budnik, Jha, Matus, and Nietzel issued a definitive proxy statement soliciting stockholder votes in advance of the Company's annual meeting, to be held on February 2, 2022 (the "2021 Proxy").  [CAC ¶ 141]. The 2021 Proxy solicited shareholder votes in favor of four management proposals, including, as relevant to the Consolidated Amended Complaint, 1) the election of Sarin, Matus, and Ortmanns to new terms as directors and 2) an advisory vote on executive compensation.  [Id.].

As part of the advisory vote on executive compensation, the 2021 Proxy informed stockholders that executive compensation was comprised of a base salary and awards under the Company's Short-Term Incentive Plan ("STIP") and Long-Term Equity Incentive Plan, which in

turn were based on achieving certain financial targets. [CAC ¶ 143]; see also [id. ¶ 144 ("The STIP was intended to '[f]ocus executives on achieving annual financial and non-financial results that are key indicators of annual financial and operational performance[.]'")]. The 2021 Proxy further stated that management had achieved 107% of the revenue target and 88% of the bookings target for the year. [Id. ¶ 145]. Based on the weighted average payout of achieving these targets, Defendants Dhawan, Gallenberger, and Ortmanns were awarded STIP bonuses for fiscal year 2021. [Id. ¶¶ 145, 147]. Defendants Sarin, Matus, and Ortmanns were also reelected to new terms as directors. [Id. ¶ 147].

## II.    STANDARD OF REVIEW

### A.    Rule 12(b)(6)

On a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the Court must accept as true all well-pleaded facts, analyze them in the light most favorable to the plaintiff, and draw all reasonable inferences from those facts in favor of the plaintiff. United States ex rel. Hutcheson v. Blackstone Med., Inc., 647 F.3d 377, 383 (1st Cir. 2011). Additionally, "a court may not look beyond the facts alleged in the complaint, documents incorporated by reference therein and facts susceptible to judicial notice." MIT Fed. Credit Union v. Cordisco, 470 F. Supp. 3d 81, 84 (D. Mass. 2020) (citing Haley v. City of Bos., 657 F.3d 39, 46 (1st Cir. 2011)). "[A] complaint must provide 'a short and plain statement of the claim showing that the pleader is entitled to relief[,]'" Cardigan Mountain Sch. v. N.H. Ins. Co., 787 F.3d 82, 84 (1st Cir. 2015) (quoting Fed. R. Civ. P. 8(a)(2)), and set forth "factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory," Pitta v. Medeiros, 90 F.4th 11, 17 (1st Cir. 2024) (quoting Gagliardi v. Sullivan, 513 F.3d 301, 305 (1st Cir. 2008)). Although detailed factual

allegations are not required, a complaint must set forth "more than labels and conclusions," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). Rather, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).

### B.    Rule 23.1 and Demand Futility

Federal Rule of Civil Procedure 23.1 imposes an additional pleading requirement on plaintiffs in stockholder derivative action. Specifically, Rule 23.1 institutes a "demand requirement," requiring the shareholder to "allege with particularity either that a satisfactory pre-suit demand was presented to, and refused by, the board of directors or the reasons such a demand would have been futile." Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of Puerto Rico, 704 F.3d 155, 163 (1st Cir. 2013); cf. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 96 (1991) ("Rule 23.1 clearly contemplates both the demand requirement and the possibility that demand may be excused . . . ." (emphasis omitted)). "[T]he circumstances in which a demand is required or, conversely, excused are determined by reference to the law of the state in which the corporation is incorporated." Unión de Empleados, 704 F.3d at 163. Where, as here, that state is Delaware, the court "must decide, as a matter of law, whether a pre-suit demand was necessary" or whether the demand was excused because it would have been futile (often referred to as "demand futility"). Yu Liang v. Berger, No. 13-cv-12816, 2015 WL 1014525, at *5 (D. Mass. Mar. 9, 2015).

Plaintiffs in this case chose not to make a pre-suit demand. As such, the question under Rule 23.1 is whether demand is excused because it was futile. Under Delaware law, to

successfully allege demand futility, a plaintiff must plead "on a director-by-director basis," that "at least half of the members" of the board of directors at the time the suit was initiated (or, the "Demand Board") either: (i) "received a material personal benefit from the alleged misconduct that is the subject of the litigation demand;" (ii) "faces a substantial likelihood of liability on any of the claims that would be the subject of the litigation demand;" or (iii) "lacks independence from someone who received a material personal benefit from the alleged misconduct that would be the subject of the litigation demand or who would face a substantial likelihood of liability on any of the claims that are the subject of the litigation demand." United Food & Com. Workers Union & Participating Food Indus. Emps. Tri-State Pension Fund v. Zuckerberg, 262 A.3d 1034, 1059 (Del. 2021). In so pleading, "the plaintiff must comply with stringent requirements of factual particularity that differ substantially from permissive notice pleadings," pursuant to which "conclusionary allegations of fact or law not supported by allegations of specific fact may not be taken as true." IBEW Loc. Union 481 Defined Contribution Plan & Tr. on Behalf of GoDaddy, Inc. v. Winborne, 301 A.3d 596, 617 (Del. Ch. 2023) (cleaned up).

## III.    DISCUSSION

### A.    Demand Futility

Defendants move to dismiss Plaintiffs' Consolidated Amended Complaint on the grounds that Plaintiffs have failed to adequately allege that a pre-suit litigation demand on Cerence's Board would have been futile. [ECF No. 40 at 18]. Specifically, Defendants assert that 1) "Plaintiffs cannot establish demand futility based on a lack of independence, because they do not even challenge the independence of six out of eight Demand Board members," [id. at 18–20]; 2) the Consolidated Amended Complaint "does not expressly allege that any member of the Demand Board received a material personal benefit from the alleged misconduct," [id. at 20];

and 3) Plaintiffs do not adequately plead that at least a majority of the Demand Board faces a substantial likelihood of liability, [id. at 20–29].  In their opposition, Plaintiffs abandon their argument that any member of the Demand Board received a material personal benefit from the alleged misconduct, see generally [ECF No. 43], and they only contend that two directors (Ortmanns and Beaudoin) lacked independence, [id. at 25–27], which is far from a majority of the Demand Board.[4]  As such, the key inquiry is whether a majority of the Demand Board faced a substantial likelihood of liability on any of Plaintiffs' claims.[5]

### 1.  Section 14(a) of the Exchange Act (Count I)

Plaintiffs contend that a majority of the Demand Board faces a substantial likelihood of liability on their claim that Defendants violated Section 14(a) of the Exchange Act, 15 U.S.C. § 78(n)(a), and Rule 14a-9, 17 C.F.R. § 240.14a-9(a), promulgated thereunder, [CAC ¶¶ 187–94 (Count I)], which together prohibit solicitation by means of a proxy statement containing "any statement which, at the time and in the light of the circumstances under which it is made, . . . omits to state any material fact necessary in order to make the statements therein not false or misleading," id.  To prevail on a claim under Section 14(a), a plaintiff must show that: 1) the

---

[4] Plaintiffs argue that the Court should address whether Ortmanns and Beaudoin lacked independence, despite not constituting a majority of the Demand Board, because the demand inquiry "proceeds on a director-by-director basis, and directors can be disqualified for different reasons."  [ECF No. 43 at 25 n.14].  As discussed supra, the Consolidated Amended Complaint fails to plead that the six remaining members of the Demand Board face a substantial likelihood of liability on Plaintiffs' claims.  Thus, the Court need not assess whether demand was futile as to Ortmanns and Beaudoin for lack of independence, as, even assuming that it was, the majority of the Board would still have been able to independently consider a pre-suit demand.

[5] Plaintiffs' Consolidated Amended Complaint brings one count for contribution.  [CAC ¶¶ 202–08 (Count III)].  Plaintiffs concede that this claim has been mooted by the settlement of the Securities Class Action.  [ECF No. 43 at 16 n.13].  Thus, the Court need not and will not address it in analyzing whether the Demand Board faces a substantial likelihood of liability.

proxy statement contained a material misstatement or omission, that 2) caused plaintiff's injury, and 3) the proxy solicitation was an essential link in the accomplishment of the transaction. Mills v. Elec. Auto-Lite Co., 396 U.S. 375, 384 (1970).  A misrepresentation or omission is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."  TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976).

As to the first prong, Plaintiffs assert that the Demand Board faces a substantial likelihood of liability under Section 14(a) because the December 30, 2021 Proxy Statement "contained material omissions, directly attributable to the Individual Defendants, that made statements contained [within it] materially misleading."  [ECF No. 43 at 16].  Specifically, Plaintiffs contend that the 2021 Proxy "included information about Cerence's short and long-term incentive targets and the performance of certain executives—including defendants Dhawan, Gallenberger, and Ortmanns—in achieving those targets, but failed to disclose any information about the pull-forward scheme and[,] by extension, the fact that but for that scheme's conversion of variable licenses and use of minimum commitment deals, the incentive targets would not have been met."  [Id. at 16–17 (citing CAC ¶¶ 143–46, 190)].

Defendants respond that this Court "already rejected this argument [i]n its opinion in the Securities Class Action," where it held that "general statements about 'Cerence's overall sales pipeline and ability to meet its overall future revenue projection[s]' were not misleading."  [ECF No. 45 at 8 (quoting Cerence I, 2024 WL 1258149, at *15)].  They further contend that the argument has "a fatal timing problem[, as] the challenged Proxy came out on December 30, 2021," which is over a month after the Consolidated Amended Complaint alleges Cerence "announced $71 million in FY2021 fixed revenues, warning that these levels 'put a little bit of a

damp around growth rates for [2022] and possibly into fiscal 2023 as well, as those licenses get consumed.'" [6]   [Id. at 8–9 (citing CAC ¶ 116)].

The Court agrees with Defendants.  This Court previously held in ruling on the Securities Class Action that, pursuant to Section 10(b), omission of the alleged "pull-forward scheme" from generic statements about the Company's "strong pipeline for future business" and "strong financial position based on market factors" did not render those statements materially false or misleading.  Cerence I, 2024 WL 1258149 at *15.  Instead, this Court endorsed the much narrower theory that the failure to disclose the alleged pull-forward scheme was only actionable where the underlying statements "were specific to revenue from fixed and/or variable licenses," such that the omission altered the "total mix" of information available to reasonable investors. Id. at *14–15 (holding omission of alleged pull-forward scheme actionable where omission suggested to a reasonable investor that the Company had a "bias toward limiting the number of fixed license agreements" or that "the increase in fixed licenses was an aberration").  Plaintiffs offer no compelling explanation for why, pursuant to this rationale, the Court should find the 2021 Proxy materially false or misleading.  As alleged in the Consolidated Amended Complaint,

---

[6] Defendants additionally move to dismiss on the grounds that Plaintiffs' Section 14(a) claim is not a proper derivative claim as a matter of Delaware law and rather must be brought directly by the shareholder.  [ECF No. 40 at 21].  Defendants' cited case law, however, addresses whether a strong public policy exists in favor of plaintiffs being permitted to bring derivative actions under Section 14(a) such that Delaware law should decline to enforce corporate bylaws that would preclude those claims.  Lee v. Fisher, 70 F.4th 1129, 1146–47 (9th Cir. 2023).  It does not speak to whether Plaintiffs' Section 14(a) claim, as pleaded, should properly be considered direct or derivative under Delaware law, which requires analysis of "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)."  Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004).  Defendants do not engage in this analysis, and this Court need not reach it, given that it finds that the Demand Board does not face a substantial likelihood of liability on the merits of the Section 14(a) claim.

the 2021 Proxy made no statements regarding the past or future importance of fixed and/or variable license contracts to revenue results, nor is it alleged to have misstated any results.  See [CAC ¶¶ 141–47].  Rather, the 2021 Proxy accurately reported on the Company's success in meeting financial targets for fiscal year 2021, such that shareholders could vote on compensation and elect board members, without, however, making any guarantees or representations regarding the role of the fixed and variable license businesses to those past results or future performance. [CAC ¶¶ 143–47].  As such, the Court declines to find the 2021 Proxy actionable for the same reasons that it found similar statements non-actionable in the Securities Action.  Cerence I, 2024 WL 1258149, at *15.

Moreover, even assuming the 2021 Proxy did carry some duty to disclose the alleged pull-forward scheme, any inference that the omission was material to the shareholder vote is weakened by virtue of other information available to those shareholders at the time of the vote. Baron v. Smith, 380 F.3d 49, 57 (1st Cir. 2004) ("It is not a material omission to fail to point out information of which the market is already aware."); see also Savoy v. Bos. Priv. Fin. Holdings, Inc., 626 F. Supp. 3d 242, 250 (D. Mass. 2022) ("The total mix of information available to a shareholder also includes information outside of the proxy statement where the information is already in the public domain and readily available to shareholders.").  In particular, the Consolidated Amended Complaint alleges that, one month before the 2021 Proxy, the Company disclosed the breakdown of fixed revenue in each quarter and for all of FY2021 on an earnings call.  [CAC ¶ 116 ("On November 22, 2021, Cerence revealed that its fixed license revenue had skyrocketed to $71 million, a 42% increase over the purported maximum amount of fixed license revenue that the Company could manage (i.e., a range of $40 to $55 million.")].  By virtue of this breakdown, and without any additional information on the alleged pull-forward scheme, voting

shareholders were aware that incentive compensation targets were met in FY2021 in large part because of the number of fixed license agreements as compared to variable. Nonetheless, they chose to reward the performance through their shareholder vote. Thus, any inference that more information regarding management's push to sign fixed license agreements in fiscal year 2021 would have altered the vote is tenuous at best.

As such, based on the materials properly before it, the Court finds that Plaintiffs have not sufficiently alleged that the Demand Board faces a substantial likelihood of liability as to the Section 14(a) claim such that demand would have been futile.

2.   Breach of Fiduciary Duty (Count II)

Plaintiffs further contend that a majority of the Demand Board faces a substantial likelihood of liability on their claim for breach of fiduciary duty. [ECF No. 43 at 20]; [CAC ¶¶ 195–200 (Count II)]. They assert two separate theories for breach of fiduciary duty: 1) allegedly false and misleading disclosures, and 2) failure to exercise proper oversight (also known as a "Caremark" claim).[7]

i.   Disclosure Claim

Plaintiffs contend that the Demand Board faces a substantial likelihood of liability for making or approving false and misleading statements that the Company issued regarding fixed and variable license agreements. [CAC ¶ 198]. "Whenever directors communicate publicly or directly with shareholders about the corporation's affairs, with or without a request for shareholder action, directors have a fiduciary duty to shareholders to exercise due care, good faith and loyalty." In Re Camping World Holdings, Inc. S'holder Derivative Litig., No. 2019-cv-

_____

[7] In re Caremark Int'l Inc. Derivative Litig., 698 A.2d 959 (Del. Ch. 1996).

16

00179, 2022 WL 288152, at *12 (Del. Ch. Jan. 31, 2022) (quoting Malone v. Brincat, 722 A.2d 5, 10 (Del. 1998)), aff'd, 285 A.3d 1204 (Del. 2022).  That said, when, as here, the Company's charter includes an exculpation provision,[8] "the plaintiffs must plead particularized allegations that support the inference that the [alleged] disclosure violation was made in bad faith, knowingly or intentionally," which "requires an analysis of the state of mind of the individual director defendants." Id. at *12–13 (cleaned up); Zuckerberg, 262 A.3d at 1052 (holding that "exculpated care violations do not excuse demand").  "Delaware courts infer scienter for such claims where a plaintiff pleads with particularity that directors had knowledge that any disclosures or omissions were false or misleading or . . . acted in bad faith in not adequately informing themselves and were sufficient[ly] . . . involve[d] in the preparation of the disclosures or that the director defendants were otherwise responsible for the disclosures." Camping World, 2022 WL 288152, at *13 (cleaned up).

Plaintiffs assert that the Demand Board's disclosures regarding the pull-forward scheme were inadequate and that, as such, "[s]ubstantial likelihood of liability thus turns on the Demand Board's knowledge of the scheme."  [ECF No. 43 at 20–21].  On that front, Plaintiffs assert that the Consolidated Amended Complaint "specifically plead[s] the Demand Board's involvement with and knowledge of the pull-forward scheme."  [Id. at 21].  As to knowledge of the alleged scheme, Plaintiffs rely on Board and Audit Committee meetings, at which the Board discussed:

> (1) "that bookings were 'challenged'"; (2) that "variable royalty was lower than expected" yet during the same period, Cerence posted record revenues ahead of the Board plan, putting the Board on notice that Cerence was reliant on fixed deals to

---

[8] Specifically, the Demand Board is protected by an exculpation provision in Cerence's corporate charter concerning "the limitation or elimination of the liability of directors" for non-loyalty breaches, which provides that "no director of the Corporation shall be liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director" pursuant to Delaware General Corporation Law ("DGCL") Section 102(b)(7).  [ECF No. 41-2 at 6].

> sustain revenue growth; and (3) that fixed deals were cannibalizing variable licenses, yet Defendants represented—and did not stop the Company from representing—that fixed deals would come down in the coming year

[Id. at 22 (quoting CAC ¶¶ 173–74)].  Defendants counter that Plaintiffs fail to allege that the Demand Board had knowledge of or participated in any alleged material misstatements or omissions, including those statements that this Court found actionable in the Securities Action.  [ECF No. 40 at 25–26]; [ECF No. 45 at 11].  They contend that Plaintiffs' allegations regarding the information the Board received do not "remotely suggest[] that the Board learned of some secret plan to increase the level of fixed contracts over time," [ECF No. 45 at 11], and that, in actuality, "Board materials show that the directors received exactly the same information as investors about Cerence's historical and projected revenue," [id.], such that the Board was deceived to the same extent as the public, [ECF No. 40 at 9].

At the outset, the Court notes that it is unclear which misrepresentations or omissions in particular Plaintiffs are contending the Demand Board made or approved in bad faith.  To the extent they intend to rely on the 2021 Proxy, it cannot support a purported breach of fiduciary duty given that, as discussed supra, Plaintiffs have not adequately alleged that it was materially false or misleading.  Assuming Plaintiffs also intend to rely on the three statements this Court found actionable in the Securities Action, Plaintiffs have not pleaded any facts to support an inference that the Demand Board members were at all "involve[d] in" or "otherwise responsible for" those disclosures such that their involvement could plausibly constitute a breach of their duty of loyalty.  Camping World, 2022 WL 288152, at *13; see also In re Zimmer Biomet Holdings, Inc. Derivative Litig., No. 2019-cv-00455, 2021 WL 3779155, at *14 (Del. Ch. 2021) (finding no liability for statements "during earnings calls or at conferences where the Board is

not alleged to have played any role"); Ellis v. Gonzalez, No. 2017-cv-00342, 2018 WL 3360816, at *9 (Del. Ch. July 10, 2018) (no breach where plaintiffs "failed to allege with particularity that the Director Defendants had any involvement with the" alleged misstatements), aff'd sub nom., Ellis ex rel. AbbVie Inc. v. Gonzalez, 205 A.3d 821 (Del. 2019). Plaintiffs' Opposition points only to involvement by Defendants Dhawan and Gallenberger, [ECF No. 43 at 21], neither of whom were member of the Demand Board, and this Court's independent review of the Consolidated Amended Complaint did not unearth any allegations which would give rise to an inference that the Demand Board was involved in (or even aware) of the potentially fraudulent statements.

To the extent Plaintiffs base the alleged violation on a purported failure to correct the false and misleading statements after they were made, [ECF No. 43 at 22 n.10], the Consolidated Amended Complaint similarly does not provide any particularized allegations to support an inference that any member of the Demand Board knew of the alleged pull-forward scheme or acted in bad faith in not adequately becoming informed about it or not correcting statements about it. To the contrary, Board-level documents produced pursuant to Section 220 and incorporated by reference in the Consolidated Amended Complaint demonstrate that the Board and the Audit Committee received detailed quarterly reporting about fixed and variable license agreements, including breakdowns of the proportion of revenue attributed to each, and that the numbers mirrored what the Company disclosed to the public. See supra. To be sure, the Board and the Audit Committee, by virtue of these presentations, certainly knew that the Company was experiencing heightened fixed revenue at the expense of variable revenue. Id. This general awareness, however, is a far cry from knowledge of a management-level fraudulent scheme to pull forward fixed revenue, inflate financial metrics, tout growth, and receive related incentive

bonuses.  On this front, the Consolidated Amended Complaint lacks any particularized, director-by-director allegations raising an inference that the Board knew or otherwise should have known that the Company's potential fixed revenue issue was the product of a fraudulent scheme, and, as such, the Court finds that the Demand Board does not face a substantial likelihood of liability as to the disclosure theory.

ii.    <u>Caremark Claim</u>

Plaintiffs additionally assert that a majority of the Demand Board faces a substantial likelihood of liability under <u>Caremark</u>.  To plead a <u>Caremark</u> claim, Plaintiffs must allege with particularity that directors "acted in bad faith" by (1) "completely fail[ing] to implement any reporting or information system or controls," or (2) "consciously fail[ing] to monitor or oversee" the Company's operations.  <u>Marchand v. Barnhill</u>, 212 A.3d 805, 820–21 (Del. 2019); <u>see also Horman v. Abney</u>, No. 12-cv-12290, 2017 WL 242571, at *7 (Del. Ch. Jan. 19, 2017) (board must have either 1) "utterly failed to implement any reporting or information system or controls" or 2) "kn[own] of evidence of corporate misconduct—the proverbial 'red flag'—yet acted in bad faith by consciously disregarding its duty to address that misconduct" (cleaned up)).  "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so.   Rather, the plaintiff must plead with particularity a sufficient connection between the corporate trauma and the board."  <u>In re Boeing Co. Derivative Litig.</u>, No. 2019-cv-00907, 2021 WL 4059934, at *24 (Del. Ch. Sept. 7, 2021) (cleaned up).  "As often stated, oversight liability under <u>Caremark</u> is possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." <u>Firemen's Ret. Sys. of St. Louis ex rel. Marriott Int'l, Inc. v. Sorenson</u>, No. 2019-cv-00965, 2021 WL 4593777, at *11 (Del. Ch. Oct. 5, 2021) (citation omitted).

Plaintiffs do not to argue that the Demand Board members face liability under the first prong of Caremark for failure to implement internal controls.  [ECF No. 43 at 23].  Rather, Plaintiffs contend that "the Demand Board knew of the pull-forward scheme, and yet 'acted in bad faith by consciously disregarding its duty to address that misconduct.'"  [Id. (quoting Horman, 2017 WL 242571, at *7)].  As discussed supra, however, the CAC lacks particularized allegations that any member of the Demand Board knew of the alleged pull-forward scheme, and Plaintiffs fail to point to any "red flags" that the Demand Board allegedly disregarded in discharging its fiduciary duties.  [ECF No. 43 at 223–24]; see also Boeing, 2021 WL 4059934, at *24 ("[O]ur law will hold directors personally liable only where, in failing to oversee the operations of the company, 'the directors knew that they were not discharging their fiduciary obligations.'" (quoting Stone v. Ritter, 911 A.2d 362, 370 (Del. 2006))).  Plaintiffs' conclusory allegation that, because misconduct occurred, the Demand Board must have known and failed to act is insufficient to state a Caremark claim.  City of Birmingham Ret. & Relief Sys. v. Good, 177 A.3d 47, 59 (Del. 2017) (plaintiffs may not simply "equate a bad outcome with bad faith").

### 3.  Brophy (Count IV)

Plaintiffs assert that a majority of the Demand Board faces a substantial likelihood of liability on Plaintiffs' insider trading claim (commonly referred to as a "Brophy" claim).[9]  Only one Demand Board member (Ortmanns) is alleged to have committed a Brophy violation, which, as Defendants observe, necessarily does not raise a substantial likelihood of Brophy liability for a majority of the Demand Board.  [CAC ¶¶ 209–15].  As to these other Demand Board members, Plaintiffs merely contend that they are "interested as to Count IV" such that demand is futile

---

[9] Brophy v. Cities Serv. Co., 70 A.2d 5 (Del. Ch. 1949).

"because they cannot pursue a <u>Brophy</u> claim without implicating themselves on the other claims"—i.e., for a non-exculpated breach of fiduciary duty. [ECF No. 43 at 24]. Having found, however, that "none of the Demand Board directors face a substantial likelihood of liability with respect to" the fiduciary duty claims, the Court has "no reason to doubt [the Demand Board's] impartiality to consider a demand as to [the <u>Brophy</u>] claim." <u>In re TrueCar, Inc. S'holder Derivative Litig.</u>, No. 2019-cv-00672, 2020 WL 5816761, at *23 (Del. Ch. Sept. 30, 2020).

### 4.   <u>Unjust Enrichment (Count V)</u>

Plaintiffs and Defendants agree that Plaintiffs' remaining unjust enrichment claim "rises or falls with Plaintiffs' breach of fiduciary duty claims as a matter of demand futility." [ECF No. 43 at 25]' [ECF No. 40- at 29–30]. Because Plaintiffs have not shown that the Demand Board faces a substantial likelihood of liability on the fiduciary duty claims, demand is similarly not excused as to the unjust enrichment claim.

### B.   **Failure to State a Claim**

Because Plaintiffs failed to make a demand on the Board, the Court need not reach Defendants' arguments on the merits.

## IV.   CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is **<u>GRANTED</u>**.

**SO ORDERED.**

June 18, 2025                                           */s/ Allison D. Burroughs*
                                                        ALLISON D. BURROUGHS
                                                        U.S. DISTRICT JUDGE